[Sac. No. 7987. In Bank. Apr. 19, 1974.]

JAMES COAN et al., Petitioners, v.
THE STATE OF CALIFORNIA et al., Respondents.

## Counsel

Robert J. Sullivan, Loren E. McMaster, Allen R. Link and Michael D. Stump for Petitioners.

Richard K. Turner and Stephen S. Boynton as Amici Curiae on behalf of Petitioners.

Evelle J. Younger, Attorney General, Willard A. Shank, Assistant Attorney General, and Talmadge R. Jones, Deputy Attorney General, for Respondents.

Irving Jaffe, Acting Assistant Attorney General, D. Dwayne Keyes, United States Attorney, Brewster Q. Morgan, Assistant United States Attorney, William E. Nelson and William C. White as Amici Curiae.

## Opinion

**CLARK, J.**—A state employee, on behalf of himself and others, and the California State Employees' Association petition for peremptory writ of

mandate compelling California officials to prepare a payroll and to pay wage increases in accordance with the California Budget Act of 1973. (Stats. 1973, ch. 129.) ■ We issued an alternative writ.[1]

The Budget Act of 1973 includes appropriations for an average increase in state salaries of 11.5 percent.[2] However, the Cost of Living Council (council) filed notice of challenge and an order temporarily restraining payment of the increase. Following hearing on 29 August 1973, the council allowed only a 7 percent increase, and the California Director of Finance promptly filed his objections.

The question whether the council is authorized by Congress to limit state salaries was not raised at the council hearing. Rather, California argued that state salaries are based on comparable jobs in other sectors of the economy, that lengthy proceedings to determine comparability create a 4- to 16-month lag, that the salary increase proposed by the Budget Act of 1973 will not bring state employee salaries up to other government and private sector levels, and that, when viewed over a period of years, the state increases are not inconsistent with council standards. It was further pointed out that when Governor Reagan vetoed a pay raise for budgetary reasons in 1971, he recognized the raise was warranted and would be restored when funds became available.

Petitioners contend the council is not empowered by statute to regulate the internal affairs of a sovereign state and therefore may not control salaries paid state employees.[3] Respondents demur, claiming exclusive jurisdiction lies in the district courts of the United States under section 211(a) of the Economic Stabilization Act of 1970 (the act)[4] and that a defect in parties exists by failure to join the council. In addition to claiming lack of jurisdiction, the United States of America asserts that Congress empowered the council to regulate state salaries.

### The Act

Section 203(a) of the act authorizes the President to stabilize wages, section 204 permitting him to delegate such power to boards or commis-

---

[1] A motion to intervene by the United States of America was denied by this court on 26 September 1973, but permission was granted to file an amicus curiae brief.

[2] The percentage figures used by the parties vary slightly because of differences in methods of computation.

[3] By letter to this court, the Governor has joined in the contention that Congress did not authorize the council to regulate salaries of state employees. The Governor also questions whether Congress may constitutionally regulate such salaries.

[4] The act may be found in the 1973 pocket part of 12 United States Code Annotated, following section 1904.

sions. Section 209 allows the Attorney General to enforce the act through restraining order and injunction in the federal courts.

Section 210 provides: "Any person suffering legal wrong because of any act or practice arising out of this title, or any order or regulation issued pursuant thereto, may bring an action in a district court of the United States, without regard to the amount in controversy, for appropriate relief, including an action for a declaratory judgment, writ of injunction (subject to the limitations in section 211), and/or damages."

Section 211 provides: "The district courts of the United States shall have exclusive original jurisdiction of cases or controversies arising under this title, or under regulations or orders issued thereunder, notwithstanding the amount in controversy; except that nothing in this subsection or in subsection (h) of this section affects the power of any court of competent jurisdiction to consider, hear, and determine any issue by way of defense (other than a defense based on the constitutionality of this title or the validity of action taken by any agency under this title) raised in any proceeding before such court. If in any such proceeding an issue by way of defense is raised based on the constitutionality of this title or the validity of agency action under this title, the case shall be subject to removal by either party to a district court of the United States in accordance with the applicable provisions of chapter 89 of title 28, United States Code [chapter 89 of Title 28]."

Section 211 further provides a Temporary Emergency Court of Appeals with exclusive jurisdiction over appeals from district courts in cases arising under the act.

### Subject Matter Jurisdiction

We are satisfied that when sections 209, 210, and 211 are read together (as they must be), they do not preclude jurisdiction over this action by the California courts.

Section 209 only provides for federal jurisdiction in actions by the Attorney General. Therefore it does not provide federal jurisdiction in this case.

Section 210, providing for federal jurisdiction in litigation brought by individuals, may not be interpreted as providing for federal jurisdiction in actions by them against a state. The decision at the last term in *Employees* v. *Missouri Public Health Dept.* (1973) 411 U.S. 279, 285 [36 L.Ed.2d 251, 256, 93 S.Ct. 1614, 1618] is controlling.

In that case employees sought overtime compensation from Missouri

under the Fair Labor Standards Act. Although Congress had expressly manifested its intent to bring the state employees involved within the substantive provisions of the statute, the United States Supreme Court held that, in the absence of express language providing that states were subject to the federal court remedies given employees generally, Congress did not intend states to be subject to those remedies. Similarly, here the absence of express provision for actions against a state by persons suffering legal wrong requires the conclusion that Congress never intended section 210 to authorize federal jurisdiction in actions by such persons against a state.

Since neither section 209 nor section 210 may be read as providing federal court jurisdiction for the instant action, section 211 may not then be interpreted as mandating exclusive federal jurisdiction. Coming immediately after two sections granting jurisdiction to the federal courts, section 211, providing for exclusive jurisdiction in the federal courts, must be read in the light of the preceding sections. It would be unreasonable to conclude that an action is restricted to the federal court when the federal court has not been given jurisdiction. Any doubt is dispelled by the crucial words in the three sections being almost identical: "order or regulation under this title" (§ 209); "arising out of this title or any order or regulation issued pursuant thereto" (§ 210); and "arising under this title or under regulations or orders issued thereunder" (§ 211).

Were not the statutory pattern so clear, practical considerations would in any event require the conclusion that Congress did not intend to preclude state court jurisdiction over the instant action. The absence of state jurisdiction would mean that state employees would be unable to sue their state to recover salaries when the act has been placed in issue.

An unconsenting state is immune from federal court suits brought by its own citizens and citizens of other states. (U.S. Const., Amend. XI; *Edelman* v. *Jordan* (1974) 415 U.S. 651 [39 L.Ed.2d 662, 94 S.Ct. 1347]; *Employees* v. *Missouri Public Health Dept., supra,* 411 U.S. 279, 280 [36 L.Ed.2d 251, 254, 93 S.Ct. 1614, 1616]; *Hans* v. *Louisiana* (1890) 134 U.S. 1, 9 et seq. [33 L.Ed. 842, 845 et seq., 10 S.Ct. 504].) Although consent to federal court suit may be implied on the basis of interstate activities by a state, the implication of state consent may not be founded upon an act "wholly within its own sphere of authority." (*Parden* v. *Terminal R. Co.* (1964) 377 U.S. 184, 196 [12 L.Ed.2d 233, 242, 84 S.Ct. 1207]; *Employees* v. *Missouri Public Health Dept., supra,* 411 U.S. 279, 282 [36 L.Ed.2d 251, 255, 93 S.Ct. 1614, 1617].) Since that sphere encompasses the activities of most state employees, they are precluded from suing in federal court. It does not appear reasonable to imply an intent to Congress to deprive the

employees of their right to sue in state courts, thereby denying them a forum in cases where the issues include council regulations.

It should also be pointed out that, as we shall see, the substantive provisions of the act are not applicable to state salaries, and, although not necessarily determinative, this provides a further reason to conclude the exclusive jurisdiction provisions of section 211 are not applicable here.[5]

### Original Jurisdiction

Because the instant case presents an important issue of federal-state relationship, is of importance to numerous persons including all state employees, and affects the public fisc and the state's ability to compete in the labor market, we deem it appropriate to exercise our original jurisdiction pursuant to article VI, section 10 of the California Constitution. (*San Francisco United School Dist.* v. *Johnson* (1971) 3 Cal.3d 937, 944-945 [92 Cal.Rptr. 309, 479 P.2d 669]; *County of Sacramento* v. *Hickman* (1967) 66 Cal.2d 841, 845 [59 Cal.Rptr. 609, 428 P.2d 593].)

Although a claim for payment of salary is in effect a money claim, mandamus is a proper remedy where the dispute concerns the proper construction of a statute or ordinance giving rise to the official duty to pay the salary claim. (*Tevis* v. *City & County of San Francisco* (1954) 43 Cal.2d 190, 198 [272 P.2d 757].) No reason appears to distinguish cases where, as here, the dispute concerns validity of the statute providing for the salary.

### Defect in Parties

Respondents' claim that the United States of America is an indispensable party is refuted by the authority cited, a decision of the Temporary Emergency Court of Appeals which recognizes the United States is not an indispensable party to every action involving council regulations. That case recognizes the council need not be joined if its interests are properly represented. (See pp. 12-13 of respondents' opposition.) We have permitted the United States to file as amicus curiae. In a similar case the Ohio Supreme Court also held that omission of the United States as a party did not cause a defect in parties. (*State* ex rel. *Fry* v. *Ferguson* (1973) 34 Ohio St.2d 252 [63 Ohio Ops.2d 392, 298 N.E.2d 129, 131-132].)

---

[5]Having concluded the instant case does not come within the exclusive jurisdiction provision of section 211, it is unnecessary to reach the question whether this action falls within the section's exception for state court jurisdiction subject to a right of removal. (Removal has not been sought herein.)

## Application of the Act

The act does not expressly provide for regulation of state employee salaries. The only provision bearing on state regulation declares state rent regulating does not exempt rents from the act.

Relative to the recurring question whether federal legislation failing to mention the states is nevertheless applicable to the states, the settled rule is that an unexpressed purpose of Congress to set aside state regulation of internal affairs is not lightly to be inferred. (E.g., *Penn Dairies* v. *Milk Control Comm'n* (1943) 318 U.S. 261, 276 [87 L.Ed. 748, 757, 63 S.Ct. 617]; *Parker* v. *Brown* (1943) 317 U.S. 341, 351 [87 L.Ed. 315, 326, 63 S.Ct. 307].)[6] A related, settled rule is "that statutes which in general terms divest pre-existing rights or privileges will not be applied to the sovereign without express words to that effect." (*United States* v. *Mine Workers* (1947) 330 U.S. 258, 272 [91 L.Ed. 884, 902, 67 S.Ct. 677].) The viability of these rules is reflected by the decision of the United States Supreme Court at the last term in *Employees* v. *Missouri Public Health Dept., supra,* 411 U.S. 279.

As illustrated by the last-cited case, the rules have "been emphatically and most commonly announced under statutes whereby it is asserted that the government is amenable to suit." (3 Sutherland, Statutory Construction (3d ed., Horack ed. 1943) § 6301, p. 188.) The principles apply with even greater force when an administrative tribunal is claiming a state is subject to its jurisdiction so that it may totally or partially invalidate state laws.

Two exceptions to the above rules have been recognized but are inapplicable here. In cases coming within the exceptions the courts have looked to rules of construction and matters extrinsic to the statute in determining whether general federal legislation is applicable to the states. The first exception is for regulation of activities constituting a proprietary rather than a governmental function. (*United States* v. *California* (1936) 297 U.S. 175, 186 [80 L.Ed. 567, 573-574, 56 S.Ct. 421]; *Ohio* v. *Helvering* (1934) 292 U.S. 360, 370 [78 L.Ed. 1307, 1310, 54 S.Ct. 725]; 3 Sutherland, Statutory Construction, *supra,* § 6302, p. 193.) Here there is more than proprietary activity since the council's order extends to substantially all state employees, including those engaged in governmental functions.

The second applies where the objective of the statute could not be

---

[6]A similar rule is applied to enactments of our Legislature. (*State of California* v. *Marin Mun. W. Dist.* (1941) 17 Cal.2d 699, 704-705 [111 P.2d 651].)

accomplished without including the government. *(California v. United States* (1944) 320 U.S. 577, 585 [88 L.Ed. 322, 330, 64 S.Ct. 352]; 3 Sutherland, Statutory Construction, *supra,* § 6302, p. 193.) Regulation of state employee salaries is not essential to the act's purpose of limiting inflation. Taxpayers' concerns obviously provide an effective brake on state employee salary increases. Although such increases may contribute to increased inflation, it is obvious that, where national guidelines on salary increases are established, political considerations require state employee salaries be justified in light of both the state economy and federal policy. The conclusion that the second exception is inapplicable is supported by experience as well as reason. During both World War II and the Korean War governmental employees' salaries were administratively exempt from regulation. (See 117 Cong. Rec. § 19949 (1971).) Moreover, because governmental salaries such as California's are ordinarily based on comparable jobs in other sectors of the economy (see e.g., 5 U.S.C. § 5301; Gov. Code, § 18850), limitation on the latter will effectively limit the former.[7]

The United States argues that proceedings of Congress reflect an intent to make the act applicable to state employee salaries. It does not claim the *original* proceedings reflect that intent—rather, it asserts that *subsequent* proceedings in 1971 to amend and extend the act reflect such intent. (The Economic Stabilization Act Amendments of 1971, 85 Stat. 743.)[8]

However, in the absence of some ambiguity in the statute, revelations of statutory history may not overcome the settled rule excluding states from general federal laws. Aside from cases coming within the two exceptions discussed above, the only case cited or found where the Supreme Court held congressional intent to regulate internal affairs of the state

[7]The foregoing consideration is reflected by the regulation of federal employee salaries. In a statute adopted at the same time as the 1971 amendments, Congress provided that comparability adjustments of federal employee pay under 5 United States Code section 5305 based on the 1971 Bureau of Labor Statistics Survey shall not be greater than Cost of Living Council guidelines established for private industry. The statute did not limit other pay increases, and apparently only the January 1972 increases were affected. In May 1972 Congress in effect reversed itself as to adjustments based on prevailing wage rates, abrogating the limitation placed on adjustments and providing for retroactive pay increases to federal employees based on wage surveys, notwithstanding the executive orders establishing the Cost of Living Council. (86 Stat. 146.)

[8]The United States relies on (1) the administrative construction of the act prior to the adoption of the amendments, (2) a report of the Senate Committee on Banking, Housing and Urban Affairs stating the committee had rejected a number of enumerated exemptions, one of which was for state employees, (3) the rejection by the Senate of an amendment dealing with state employee salaries, and (4) a statement at hearings of the House Committee on Banking and Currency by Chairman Connally of the Cost of Living Council stating the council could regulate state employee salaries.

could be established by implication is *Case* v. *Bowles* (1946) 327 U.S. 92 [90 L.Ed. 552, 66 S.Ct. 438], involving a sale of goods by a state in violation of the Emergency Price Control Act. That act expressly applied to " 'the United States or any agency thereof, or any other government, or any of its political subdivisions, or any agency of any of the foregoing.' " The court rejected the argument that failure to specifically mention "states" exempted them, concluding the reference to "any other government" included states. (327 U.S. at p. 99 [90 L.Ed. at p. 558].)

The cases stating that an unexpressed intent of Congress to regulate state internal affairs should not be implied do not discuss history of legislative proceedings. The reason may be that the settled rule is not a true rule of construction but is essentially a "housekeeping" one for the drafting of statutes.

Although at an earlier date it might have been argued that extrinsic aids could be used in cases of congressional silence, the now settled rule tells Congress to remain silent when there is no intent to regulate the internal affairs of the states. There is no reason to now conclude silence reflects ambiguity—the condition for resort to extrinsic aids. Having repeatedly advised Congress that failure to expressly mention the states means general legislation will not be applicable to the states' internal affairs, it seems unreasonable for the courts, when Congress has seemingly accepted the invitation to reflect its intent by silence, to repudiate the invitation and conclude there is ambiguity. In the absence of ambiguity, there is no reason to resort to rules of construction and extrinsic aids.[9]

---

[9]However, assuming that it would be proper to conclude congressional silence creates ambiguity and to resort to extrinsic aids, it is doubtful whether there is sufficient showing to justify inclusion of the states. Before an intent to regulate internal affairs may be inferred in an ambiguous statute, the ambiguity must be eliminated by resort to the extrinsic aids (*Penn Dairies* v. *Milk Control Comm'n, supra,* 318 U.S. 261, 276; *Parker* v. *Brown, supra,* 317 U.S. 341, 351), and it does not appear there has been sufficient showing to eliminate all ambiguity.

There is no showing at all that Congress, when it originally adopted the act, intended it to apply to the states. All matters relied on occurred in late 1971 when Congress amended it and extended its term. Thus, there is no reason to believe that Congress, when it originally passed the act, believed it was applicable to the states. In addition, none of the 1971 amendments contains language reflecting an intent on the part of Congress to make the act applicable to the states.

Although the construction of a statute by the officials charged with its administration is entitled to weight, final responsibility for interpretation of the law rests with the courts, and "an erroneous administrative construction does not govern the interpretation of a statute, even though the statute is subsequently reenacted without change." (*Whitcomb Hotel, Inc.* v. *Cal. Emp. Com.* (1944) 24 Cal.2d 753, 756-758 [151 P.2d 233, 155 A.L.R. 405]; *Biddle* v. *Commissioner* (1938) 302 U.S. 573, 582 [82 L.Ed. 431, 438-439, 58 S.Ct. 379].) Administrative construction is probably

The Ohio Supreme Court has also concluded the act is inapplicable to state salaries. (*State* ex rel. *Fry* v. *Ferguson, supra,* 298 N.E.2d 129, 131.)

In *United States of America* v. *The State of Ohio* (25 Oct. 1973) the Temporary Emergency Court of Appeals concluded that Congress intended the act to apply to state salaries. Although recognizing the settled rule excluding internal affairs of the states from general federal statutes, the court relied upon the administrative construction, the statutory history, and the cases of *Case* v. *Bowles, supra,* 327 U.S. 92, 99 [90 L.Ed. 552, 558], *United States* v. *California, supra,* 297 U.S. 175, 186, and *Northern*

---

entitled to less weight where the question is whether the administrator has usurped power by extending jurisdiction over parties and matters than where the question is whether the administrator has properly exercised his power as to matters and parties clearly within his jurisdiction.

Rejection of a proposed amendment is some evidence that the legislative body did not intend the rejected provisions to be part of the statute, but "caution must be exercised in using the action of the legislature on proposed amendments as an interpretive aid." (2A Sutherland, Statutory Construction (4th ed. 1973) § 48.18, pp. 224-225.) The rejection may occur because the bill in substance already includes the provisions of the amendment or because unwritten law would produce the same result without the proposed amendment. (*Id.*) In light of the settled rule discussed above, the latter reason may have weighed heavily in the minds of some or many Senators in rejecting the amendment relating to state employee salaries. Another consideration is that adoption of an amendment is ordinarily viewed as a change in the law (*id.*), and some Senators may have voted against the amendment because to adopt it would have furnished an implication that the act was applicable to states prior thereto. The language of the amendment itself furnishes such implication. Moreover, the amendment would have provided for some regulation of state employee salaries. In the circumstances, rejection of the amendment by the Senate may not be given great weight.

The rejection of exemption for state employee salaries by the Senate Committee on Banking, Housing and Urban Affairs is contained in a part of its report where several additional proposed exemptions are also rejected. None of the reasons furnished by the committee for rejecting the exemptions is directed specifically to state employee salaries, and the committee refers to "firms" rather than states. In the absence of specific reasons for rejecting the exemption of state employee salaries, the possibility remains that the exemption was rejected for lack of necessity rather than on the merits. Furthermore, although committee reports are entitled to substantial weight, they ordinarily are not conclusive to the exclusion of other rules of construction. (2A Sutherland, Statutory Construction, *supra,* § 48.06, p. 203.)

A substantial argument might be made that viewed together the committee report and the proceedings on the proposed amendment, in light of the administrative construction, eliminates ambiguity as to the intent of the Senate. However, these matters are not decisive. Whatever the merits of the showing of intent of the Senate, the House proceedings do not furnish justification for departure from the settled rules.

The principal matter relied upon by the United States with respect to the House is a statement made during committee hearings by Chairman Connally of the Cost of Living Council that the act is applicable to state employee salaries. Ordinarily statements made by witnesses at committee hearings as to the nature and effect of a bill are not accorded any weight by the courts. (2A Sutherland, Statutory Construction, *supra,* § 48.10, pp. 209-210.) Although the testimony of the administrator may be entitled to some weight, it is insufficient to constitute a compelling showing.

*States Power Company* v. *State of Minnesota* (8th Cir. 1971) 447 F.2d 1143, 1147-1148. Administrative construction and statutory history have been discussed. (See fn. 9.) *Case,* as pointed out above, involved a statute expressly mentioning the United States and "any other government"; and *United States* v. *California* involved a proprietary activity, railroads, historically regulated by the federal government.

The remaining case, *Northern States Power Company* v. *State of Minnesota, supra,* involves the question whether federal statutes regulating leaks of radioactive effluents of power plants were intended to occupy the field to the exclusion of state regulation. Although cases dealing with the occupation-of-the-field doctrine also involve federal-state relationships, they are not in point here. In such cases, it is clear that the federal government has entered the field sought to be regulated by the state, and the question is whether all state regulation is thereby preempted, whereas the question in the instant case is whether Congress has intended to *enter* the field of state salaries.

Moreover, absurd consequences would follow from a conclusion that Congress has occupied the field. Such conclusion would mean that the federal government has taken over all regulation of state salaries and state prices so that the legislatures of the states could no longer act in the field. The reasoning of the temporary emergency court leading to such preposterous results must be rejected.

Let a peremptory writ of mandate issue as prayed.

McComb, J., and Burke, J., concurred.

**MOSK, J.**—I concur in the judgment.

While it may be late in the constitutional day to raise the issue, my unyielding respect for the traditional federalism upon which our republic was established impels me to reach agreement with the majority result solely on the basis of the Tenth Amendment to the Constitution. For the same reason I find no merit in the jurisdictional point raised by the dissent. My position is substantially that of Justices Douglas and Stewart, dissenting in *Maryland* v. *Wirtz* (1968) 392 U.S. 183, 201 [20 L.Ed.2d 1020, 1033, 88 S.Ct. 2017].[1]

---

[1]The majority opinion in *Maryland* v. *Wirtz* did not disagree with the dissenting justices on principle. Justice Harlan for the majority found that the labor conditions in the institutions involved "can affect commerce." He concluded that "while the commerce power has limits, valid general regulations of commerce do not cease to be regulations of commerce because a State is involved. If a State in engaging in

The asserted power of the federal government over state government salaries in this case rests upon the commerce clause and may be exercised only if some relationship can be demonstrated to exist between the activity to be regulated and interstate commerce. If the state acts in a proprietary capacity, usually some such relationship, albeit tenuous, can be found. (*Employees* v. *Missouri Public Health Dept.* (1973) 411 U.S. 279 [36 L.Ed.2d 251, 93 S.Ct. 1614].) Under those circumstances the distinction is between "the State as government and the State as trader" (*New York* v. *United States* (1946) 326 U.S. 572, 579 [90 L.Ed. 326, 332, 66 S.Ct. 310]). Certainly if federal funds are involved, as e.g., for highway construction and maintenance, the employees paid by or expending such funds —even though their immediate employer is the state—may be subject to acts of Congress. (*Oklahoma* v. *Civil Service Comm'n* (1947) 330 U.S. 127, 142 [91 L.Ed. 794, 805-806, 67 S.Ct. 544].)

But if all employees of the state—including those occupying purely governmental positions created by the state, paid with funds raised by the state, performing services entirely intrastate in character—are subject to whimsical control of the Congress and federal administrative agencies, "then the National Government could devour the essentials of state sovereignty, though that sovereignty is attested by the Tenth Amendment." (Douglas, J., dissenting in *Maryland* v. *Wirtz, supra,* at p. 205 [20 L.Ed.2d at p. 1036].) Chief Justice Stone also warned, concurring in *New York* v. *United States, supra,* at p. 587 [90 L.Ed. at p. 336], that the national government may not "interfere unduly with the State's performance of its sovereign functions of government."

Ever since Chief Justice Marshall sustained reciprocal immunity of the state and federal governments from intergovernmental taxation in *McCulloch* v. *Maryland* (1819) 17 U.S. (4 Wheat.) 316, 429-430 [4 L.Ed. 579, 607], it should have been clear that the "notion that the sovereign position of the States must find its protection in the will of a transient majority of Congress is foreign to and a negation of our constitutional system." (Douglas and Black, JJ., dissenting, *New York* v. *United States, supra,* at p. 594 [90 L.Ed. at p. 340].) A number of high court opinions have spoken in generality of the merits inherent in a healthy federalism. (See, e.g., Powell, J., concurring in *Johnson* v. *Louisiana* (1972) 406 U.S. 356, 376 [32 L.Ed.2d 152, 167-168, 92 S.Ct. 1620]; Harlan, J., dissenting in *Duncan* v. *Louisiana* (1968) 391 U.S. 145, 172 [20 L.Ed.2d 491, 509, 88 S.Ct. 1444]; Goldberg, J., concurring in *Pointer* v. *Texas* (1965) 380

---

economic activities that are validly regulated by the Federal Government when engaged in by private persons, the State too may be forced to conform its activities to federal regulation." (392 U.S. at pp. 196-197 [20 L.Ed.2d at p. 1031].)

U.S. 400, 414 [13 L.Ed.2d 923, 932, 85 S.Ct. 1065]; Clark, J., in *Ker v. California* (1963) 374 U.S. 23, 31 [10 L.Ed.2d 726, 736, 83 S.Ct. 1623].) In *Atlantic C. L. R. Co.* v. *Engineers* (1970) 398 U.S. 281, 285 [26 L.Ed. 2d 234, 240, 90 S.Ct. 1739], Justice Black, speaking for the court reminded us: "When this Nation was established by the Constitution, each State surrendered only a part of its sovereign power to the national government. But those powers that were not surrendered were retained by the States . . . ."

One need not disparage the motive of achieving national economic stability, as Chief Justice Hughes pointed out in *Schechter Corp.* v. *United States* (1935) 295 U.S. 495, 550 [79 L.Ed. 1570, 1591, 55 S.Ct. 837, 97 A.L.R. 947], to deny to the federal government the right to fix wages in an intrastate enterprise. For however laudable the statutory purpose, Justice Cardozo taught us, "the Tenth Amendment preserves a field of autonomy against federal encroachment." (*Hopkins Savings Assn.* v. *Cleary* (1935) 296 U.S. 315, 337 [80 L.Ed. 251, 259, 56 S.Ct. 235, 100 A.L.R. 1403].)

Some contemporary authorities, considered during the exigencies of the second world war, have reached contrary conclusions in circumstances somewhat analogous to the facts in this case. Unfortunately the imperatives of concentrated bigness—our national dimension in geography, population, industry, labor, technology—have resulted in a correlative concentration of power in the biggest government. Perhaps the trend toward centralized authority and judicial acquiescence in it are irreversible (but see Harlan, J., concurring and dissenting in *Williams* v. *Florida* (1970) 399 U.S. 78, 133 [26 L.Ed.2d 446, 472-473, 90 S.Ct. 1893]); nevertheless I suggest that a fait accompli is not necessarily desirable or constitutionally permissible. Expediency must never cause us to abdicate our responsibility to hold even generally accepted concepts to the light of constitutional scrutiny.

If we examine application of this federal act in the light of the commerce clause, we would at once experience the utter futility of trying to detect activity in interstate commerce by a janitor in the State Capitol, a stenographer in the Governor's office, an administrative assistant to a state legislator, a law clerk in this court, or, for that matter, by every state employee who is hired by the state, paid by the state and whose sphere of service is jurisdictionally circumscribed by the borders of the state. Thus this could be a classic case in which to take a firm constitutional stand for state independence in its governmental function, however anachronistic such action may seem to those who over the years have bent constitutional principles to fleeting expediency.

We issued an alternative writ of mandate. The respondent State of California, exercising the sovereign power reserved to it under the Tenth Amendment, should have responded by performing the acts incident to state sovereignty: paying the funds provided in the California Budget Act of 1973. Since the State failed to do so, a peremptory writ of mandate becomes necessary.

**SULLIVAN, J.**—I dissent. This court does not have jurisdiction of the subject matter of these proceedings.

Section 211 of the Economic Stabilization Act (the Act) unequivocally provides that "[t]he district courts of the United States shall have *exclusive* original jurisdiction of cases or controversies *arising under* this title, or under regulations or orders issued thereunder . . . ."[1] (Italics added.) The sole question to be answered in order to determine the jurisdictional issue is whether this is a case or controversy "arising under" the Act.

In paragraph V of the petition for writ of mandate, it is alleged that Congress, in enacting the Economic Stabilization Act, "did not grant authority to the President or any federal administrative body to regulate or control the internal affairs of sovereign states of the United States"; that the Cost of Living Council, Office of Wage Stabilization ordered the Governor not to carry out the salary increases except as authorized by the council; and that "[n]otwithstanding the lack of constitutional authority on the part of the Cost of Living Council, Office of Wage Stabilization, to promulgate and enforce such an order, respondents have obeyed, and threaten to continue to obey, such order, all in violation of their legal duties . . . ." In view of these allegations, as will be shown, I conclude that this case does indeed arise under the Act and therefore falls within the provisions of section 211.

To determine the meaning of "arising under" it is helpful to review some decisions interpreting section 1331, subdivision (a), of title 28 of the United States Code. This subdivision, setting forth the requirements for

---

[1]This section further provides that any court of competent jurisdiction may "hear, and determine any issue *by way of defense* (other than a defense based on the constitutionality of this title or the validity of action taken by any agency under this title) raised in any proceeding before such court. If in any such proceeding an issue *by way of defense* is raised based on the constitutionality of this title or the validity of agency action under this title, the case shall be subject to removal by either party to a district court of the United States . . . ." (Italics added.) As will be shown, however, this proviso is not applicable here since the petition for writ of mandate *initially* raises the question of the validity of the Act as applied to state employees' salaries and the constitutionality of the Cost of Living Council's order issued thereunder.

"federal question" jurisdiction, provides in pertinent part: "The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy . . . *arises under* the Constitution, laws, or treaties of the United States."[2] (Italics added.) *Starin* v. *New York* (1885) 115 U.S. 248 [29 L.Ed. 388, 6 S.Ct. 28], a leading case on federal question jurisdiction, provides a clear insight into the meaning of the critical words: "If from the questions it appears that some title, right, privilege, or immunity, on which recovery depends, will be defeated by one construction of the Constitution or a law of the United States, or sustained by the opposite construction, the case will be one *arising under* the Constitution or laws of the United States. . . ." (*Id.* at p. 257 [29 L.Ed. at p. 390], italics added.)

Later federal cases supply us with more detailed explanations as to whether a case arises under federal law. In *Eastern Air Lines, Inc.* v. *Flight Engineers Internat'l. Ass'n* (5th Cir. 1965) 340 F.2d 104, cert. den., 382 U.S. 811 [15 L.Ed.2d 59, 86 S.Ct. 23], the court quoted from earlier cases the "test of federal jurisdiction where it is asserted under the 'federal question' section. . . . 'The test is the familiar one that *it must appear from the complaint* that the construction of a federal statute will have an adverse effect on the right of recovery if the statute is construed [in] one rather than another way.' " (*Id.* at p. 106, italics added.) And in *Ivy Broadcasting Co.* v. *American Tel. & Tel. Co.* (2d Cir. 1968) 391 F.2d 486, the court clearly indicates that an action brought to enforce a "federal right" is not a prerequisite to federal question jurisdiction. "The test we have stated for determining whether a complaint presents a federal question is . . . *whether a properly pleaded 'state created' claim itself presents a 'pivotal question of federal law,' for example because an act of Congress must be construed* or ' "federal common law" govern[s] some disputed aspect' of the claim." (*Ivy, supra,* at p. 489; italics added.) The court continued: "A case may 'arise under' federal law, even though the claim is created by state law, if the complaint discloses a need for the interpretation of an act of Congress." (*Id.* at p. 492.)

The posture of the case before us clearly meets the test as defined in *Ivy*. In their application for a writ of mandate, petitioners allege that the Budget Act of 1973 provides for specified salary increases for all state employees; that the Cost of Living Council, Office of Wage Stabilization

---

[2]The fact that this section does not confer *exclusive* jurisdiction in the federal courts is of no significance here, since we are investigating only the meaning of "arising under." Thus, where federal jurisdiction is asserted under 28 United States Code section 1331, subdivision (a), the action *may* be brought in federal court; in an action arising under the Economic Stabilization Act, the suit *must* be brought in federal court. The meaning of "arising under" remains constant.

ordered respondents State of California and Governor Reagan to withhold all such wage and salary increases in excess of those permitted by the council; that the United States Congress, in enacting the Economic Stabilization Act of 1970 did not grant authority to the President or any federal administrative agency to regulate or control the internal affairs of the sovereign states; that notwithstanding the lack of constitutional authority on the part of the Cost of Living Council, the various respondents have obeyed its order; and that respondents have failed to comply with their respective legal duties and have wrongfully refused to carry out the Budget Act by not processing the salary increases. To put it another way the issues of the constitutionality of the Economic Stabilization Act and of its validity as applied to state employees are raised by petitioners; they are not interposed by way of defense. Thus by the very language of the petition, the outcome of the instant proceedings depends on a determination which must be made as to the constitutionality and validity of the Act. As in *Ivy,* petitioners have brought a special proceeding of a civil nature (Code Civ. Proc., § 1085) based on a "state created claim" which itself "presents a 'pivotal question of federal law,' . . . . because an act of Congress must be construed . . . ." It is clear that the case before us arises under the Act, and we are therefore precluded from assuming jurisdiction since section 211 of the Act expressly reserves adjudication of such issues to the federal courts.[3]

---

[3]In his dissenting opinion Justice Tobriner suggests that because petitioners could have established a "facially sufficient claim for relief"* without referring "to the existence and validity of the order of the Cost of Living Council," the instant action does not " 'aris[e] under' the stabilization act or a regulation or order issued pursuant thereto."* However, as the Supreme Court noted in *Gully* v. *First National Bank* (1936) 299 U.S. 109 [81 L.Ed. 70, 57 S.Ct. 96], cited by Justice Tobriner, it is rather futile to "attempt to define a 'cause of action' without reference to [its] context." What is called for is "something of that common sense accommodation of judgment to kaleidoscopic situations which characterizes the law in its treatment of problems of causation." The court concluded: "To set bounds to the pursuit, the courts have formulated the distinctions between controversies that are basic and those that are collateral . . . ." (*Gully, supra,* at pp. 117-118 [81 L.Ed. at pp. 74-75], passim.) In the instant case, petitioners are aggrieved for only one reason—"the Cost of Living Council has ordered the Governor not to carry out the salary increases except as authorized by the Council . . . and that . . . respondents have obeyed. and threaten to continue to obey, such order . . . ." (Petition for writ of mandate.) It is pellucid that, *regardless of the language by which petitioners seek redress of this grievance,* the basic controversy presented by their petition necessarily involves the validity of the federal agency's order. (See. e.g., *Simpson* v. *Southwestern Railroad Company* (5th Cir. 1956) 231 F.2d 59.) I do not believe that we should simply close our eyes to this, the essential context of the matter before us. To do so would be to abdicate the duty enjoined upon us by the decision in *Gully* to appreciate the context of the cause with a view towards distinguishing the

---

*Dissenting opinion by Tobriner, J., *post,* at page 307.

The majority take the position that we have jurisdiction, relying on the recent case of *Employees* v. *Missouri Public Health Dept.* (1973) 411 U.S. 279 [36 L.Ed.2d 251, 93 S.Ct. 1614], in which the Supreme Court held that a nonconsenting state could not be subjected to a suit in a federal court brought by its citizens, absent express language to that effect in a federal statute. Thus, the majority argue, we must have jurisdiction in the instant matter since otherwise the state employees would be deprived of any forum in which to litigate their cause. I find this rationale unconvincing. I know of no barrier which would preclude the State of California from bringing suit against the United States or the appropriate federal agency in the United States District Court for proper adjudication of the question.[4] Further, there is every indication that the state would be willing to pursue this remedy on behalf of its employees, or in the alternative, to consent to a suit brought by the employees in federal court.[5]

In *Missouri* it was stated that we cannot by implication assume an intent on the part of Congress to subject a state to a federal remedy, where one

controversies that are basic from those that are collateral. Indeed it was quite apparent at oral argument that in essence the petition was a challenge to the legal authority of the Cost of Living Council and that contrary to the speculation of Justice Tobriner's dissent, petitioners would not have been content with alleging merely that each of them "was a state employee entitled to the full pay increase prescribed by the California Budget Act of 1973."*

[4]Indeed, according to exhibits recently lodged in this court by the Attorney General, the state following oral argument in this case *has* initiated a proceeding in the United States District Court for the Eastern District of California seeking to raise the very constitutional issues which it would have us decide in this case. Named as defendants in the new action are the United States, the council, the council's director, and his counselor. In addition to the state, named plaintiffs include a state employee "who brings this action on behalf of himself and all others similarly situated." In view of this development, the statements of the majority citing the employees' lack of another forum as a reason for exercising *original* state jurisdiction take on a particularly hollow ring. It is also interesting to note that in the new federal action jurisdiction is based in part on section 211 of the Act, which, according to the complaint, "vests exclusive original jurisdiction of cases or controversies arising under the Act or regulations or orders issued thereunder, in the District Courts of the United States."

[5]Respondents have made a return to the alternative writ of mandate by way of demurrer and answer. It is noteworthy that in their supporting memorandum of points and authorities respondents state: "By their Answer, respondents have admitted the great majority of the allegations raised in the Petition, including the contention that the United States Congress did not grant authority to the President or any federal administrative body to regulate or control the internal affairs of California, a sovereign state. [Fn. omitted.] Similarly, respondents are in accord with petitioners concerning the irreparable injury suffered by all state employees by reason of the recent actions of the Cost of Living Council. To alleviate such gross inequities, respondents are actively pursuing all available federal remedies . . . ."

*Dissenting opinion by Tobriner, J., *post,* at page 307.

is not expressly provided. By the same token, when Congress explicitly states that the federal courts shall have exclusive original jurisdiction, we cannot imply, as do the majority, that this was not the meaning intended by Congress merely because certain persons may be left with no direct remedy against a state. It cannot be doubted that Congress has the *power* to preserve exclusive jurisdiction in the federal courts in cases and controversies arising under the Constitution or laws of the United States. (*Bowles* v. *Willingham* (1944) 321 U.S. 503, 511-512 [88 L.Ed. 892, 901-902, 64 S.Ct. 641].) When this power is clearly exercised, as it is in section 211 of the Act, any attempt to override such instructions from Congress is forbidden by the supremacy clause of the Constitution of the United States. (U.S. Const., art. VI, cl. 2.)

The majority claim that there is a further reason ("although not necessarily determinative") why the jurisdiction provisions of section 211 of the Act are not applicable here. They argue that the Act itself does not apply to state employees' salaries and that therefore the jurisdictional provisions of the Act cannot apply to the instant case. This reasoning is clearly faulty.

Subject matter jurisdiction has been defined as the "power to hear or determine the case." (*Abelleira* v. *District Court of Appeal* (1941) 17 Cal. 2d 280, 288 [109 P.2d 942, 132 A.L.R. 715].) Without that power, a court is not competent to adjudicate the substantive issues before it. Thus, where a statute by its terms reserves jurisdiction of any case arising thereunder to the federal courts, a state court cannot first decide that the statute is inapplicable to a given controversy and thereby circumvent the jurisdictional restrictions in the statute itself. That such a result is incongruous is particularly evident where, as here, the applicability of the statute is the central substantive issue of the case. The majority would have us decide the substantive issue before determining whether we have the power to make such a decision. I conclude therefore that irrespective of the merits of the petition, we are bound by the supreme law of the land (U.S. Const., art. VI, cl. 2) to dismiss it since it is clear that we do not have jurisdiction of the matter.

Further, even if it be assumed for the sake of argument that this court possesses some sort of residuary jurisdiction over the subject matter of this proceeding, we should nevertheless as a matter of sound judicial policy decline to exercise our original jurisdiction in the circumstances (see Cal. Const., art. VI, § 10). Having disposed of the jurisdictional issue, the majority proceed to determine what they choose to denominate the substantive issue of the validity of the Act as applied to state employees' salaries. But the plain fact is that there is no substantive issue for us to decide

since by their answer, respondents have admitted petitioners' allegations that Congress did not grant authority to the President or to any federal agency to regulate the internal affairs of a sovereign state. The sole allegation put in issue by respondents' return to the alternative writ is the question of jurisdiction; this issue having been determined, no controversy between the parties remains to be decided.[6] That portion of the majority opinion dealing with the application of the Act is therefore merely advisory, and thus in excess of jurisdiction, since "[t]he rendering of advisory opinions falls within neither the functions nor the jurisdiction of this court." (*People* ex rel. *Lynch* v. *Superior Court* (1970) 1 Cal.3d 910, 912 [83 Cal.Rptr. 670, 464 P.2d 126].)

This view of the posture of this case is further borne out by statements made at oral argument by the Attorney General. In answer to the court's question whether this was indeed an adversary proceeding, the Attorney General replied, "That's a good question," and later stated: "I felt that it was necessary that in order to have some type of an adversary proceeding here . . . that the United States should be allowed to present their arguments here." Clearly, then, except for the question of subject matter jurisdiction raised by respondents by way of demurrer, the parties to the action are in agreement. As to the substantive matters there is no controversy to be considered and determined by this court. For this court to issue the writ of mandate which *both* parties seek is simply to allow ourselves to be used for the purpose of providing our imprimatur to the parties' agreed position. This we should emphatically refuse to do.

Respondents have been ordered by the Cost of Living Council *not* to pay wage and salary increases except to the extent permitted by the council. Faced with the stern sanctions of the Act for failure to obey this order, respondents curiously seem content to seek comfort in a judgment rendered in a proceeding which is not adversary in nature—indeed in which they appear to be in complete agreement with petitioners. I fail to see how any such judgment carries the hallmark of a contested case "pressed before the Court with that clear concreteness provided when a question emerges precisely framed and necessary for decision *from a clash of adversary argument exploring every aspect of a multi-faced situation embracing conflicting and demanding interests, . . .*" (*United States* v. *Fruehauf* (1961) 365 U.S. 146, 157 [5 L.Ed.2d 476, 483, 81 S.Ct. 547]; italics added.)

---

[6]The United States was denied permission to intervene in these proceedings, but was allowed to file an amicus curiae brief. The United States Attorney participated in the oral argument, contending inter alia that the Act does in fact apply to California state employees.

In·summary, I conclude that we have no jurisdiction to decide the case at bench since according to the clear language of the federal statute all cases arising under the Act must be brought in the United States District Courts. Moreover, even on the assumption that we did have jurisdiction of the subject matter, I am of the view that this is not a case in which we should exercise our original jurisdiction. Accordingly, I would discharge the alternative writ of mandate and dismiss the petition for the peremptory writ.

Wright, C. J., concurred.

**TOBRINER, J.**—I dissent.

Although I believe that this court has jurisdiction over the subject matter of this proceeding, I am convinced both that Congress has the power to limit state employee salary increases and that Congress intended the President and his administrative delegatees to possess this power.

Respecting, first, the jurisdictional issue, I concur with the majority's conclusion that this controversy falls outside the scope of exclusive federal district court jurisdiction. Section 210, subdivision (a), of the Economic Stabilization Act, the focus of much attention in the majority's opinion, appears intended merely to eliminate the amount-in-controversy requirement that a stabilization act claimant would have to satisfy were he to found a federal court action upon the general federal question jurisdictional statute. (28 U.S.C. § 1331, subd. (a).) Nothing within section 210, subdivision (a), suggests that Congress intended to prevent state courts from entertaining suits raising claims under the, stabilization act.[1]

Section 211, subdivision (a), on the other hand, draws a distinction between actions "arising under" the act or related regulations and actions in which the constitutionality of the act or the validity of related agency action is raised by way of defense. Congress appears to have intended that federal district courts should have exclusive original jurisdiction over those cases which "aris[e] under" the federal stabilization laws and regulations but not those in which issues concerning the validity of the stabilization act or related executive branch action are introduced by the defense.[2]

---

[1] I thus find it unnecessary to confront the implications of *Employees* v. *Missouri Public Health Dept.* (1973) 411 U.S. 279 [36 L.Ed.2d 251, 93 S.Ct. 1614], discussed in the majority opinion and Justice Sullivan's dissent.

[2] Section 211, subdivision (a), directs that federal district courts "shall have exclusive original jurisdiction of cases or controversies arising under [the stabilization act], or under regulations or orders issued thereunder." The provision further declares that "[i]f in any . . . proceeding [before "any court of competent juris-

Although Justice Sullivan points out that plaintiff Coan alleged in his mandate petition that the stabilization act did not delegate the authority to regulate state salaries, I am convinced that the presence of this allegation in his petition does not render this controversy one that "aris[es] under" the act or related regulations and orders.

It has long been established in the context of determining whether a federal district court has original federal question jurisdiction under United States Code, title 28, section 1331, subdivision (a), that a plaintiff cannot affect jurisdictional boundaries by anticipatorily pleading federal defenses. (E.g., *Gully* v. *First National Bank* (1936) 299 U.S. 109, 112-113 [81 L.Ed. 70, 71-72, 57 S.Ct. 96]; *White* v. *Sparkill Realty Corp.* (1930) 280 U.S. 500, 512 [74 L.Ed. 578, 583, 50 S.Ct. 186]; *Louisville & Nashville R.R.* v. *Mottley* (1908) 211 U.S. 149, 152-154 [53 L.Ed. 126, 127-128, 29 S.Ct. 42]. See also Bator, Mishkin, Shapiro & Wechsler, Hart & Wechsler's The Federal Courts and the Federal System (2d ed. 1973) pp. 883-885; Wright, Federal Courts (1963) § 18, pp. 52-55; Mishkin, *The Federal "Question" in the District Courts* (1953) 53 Colum.L.Rev. 157, 164, 176-184.) Although Justice Sullivan · correctly observes that an action "arises under" federal law if the federal issue "appear[s] from the complaint" (*Eastern Air Lines, Inc.* v. *Flight Engineers Internat'l Ass'n* (5th Cir. 1965) 340 F.2d 104, 106, cert. den., 382 U.S. 811 [15 L.Ed.2d 59, 86 S.Ct. 23], quoting *Dickson* v. *Edwards* (5th Cir. 1961) 293 F.2d 211, 215), the complaint must be properly composed; it may not include material unnecessary to establish plaintiff's claim for relief.[3] (See *Marshall* v. *Desert Properties Co.* (9th Cir. 1939) 103 F.2d 551, 552, cert. den., 308 U.S. 563 [84 L.Ed. 473, 60 S.Ct. 74].) And although the case before us concerns the jurisdiction of a state rather than a federal court, I discern no dispositive reason why the anticipatory defense principle should not apply in the present context. Just as an aspiring federal court plaintiff

---

diction"] an issue by way of defense is raised based on the constitutionality of [the stabilization act] or the validity of agency action under [the act], the case shall be subject to removal by either party to a district court of the United States." This removal prescription would be superfluous if state courts could not entertain cases in which questions concerning the constitutionality of the stabilization act or the validity of agency action taken pursuant thereto were raised by way of defense.

[3]Justice Sullivan's reliance upon *Ivy Broadcasting Co.* v. *American Tel. & Tel. Co.* (2d Cir. 1968) 391 F.2d 486, I believe, is misplaced. In *Ivy,* federal district court federal question jurisdiction was based upon the conclusion that the duties which plaintiff claimed defendants had breached were established and governed solely by federal law. (*Id.* at p. 491.) The case does not stand for the proposition that all "state created" claims presenting "pivotal questions of federal law" qualify for federal district court original jurisdiction, since the *Ivy* court itself acknowledged that such claims need be "properly pleaded." (*Id.* at p. 489, quoting *McFaddin Express, Incorporated* v. *Adley Corporation* (2d Cir. 1965) 346 F.2d 424, 426, cert. den., 382 U.S. 1026 [15 L.Ed.2d 539, 86 S.Ct. 643].)

cannot affect jurisdictional boundaries by prematurely interjecting federal defenses, so a resistant state court defendant cannot affect jurisdictional boundaries by exploiting the verbosity of its adversary.

All that plaintiff Coan need have alleged to establish a facially sufficient claim for relief was that he was a state employee entitled to the full pay increase prescribed by the California Budget Act of 1973. Reference in his petition to the existence and validity of the order of the Cost of Living Council was unnecessary to a complete description of his claim. His action thus cannot be said to "aris[e] under" the stabilization act or a regulation or order issued pursuant thereto.[4] I conclude, therefore, that we possess the requisite jurisdiction over the subject matter.

Turning next to the question whether Congress has the power to limit state employee salary increases, I submit that it does. (See *California Teach. Ass'n* v. *Newport Mesa Unified Sch. Dist.* (C.D.Cal. 1971) 333 F.Supp. 436, 444-445.) The power finds its source in the commerce clause (U.S. Const., art. I, § 8), and the critical inquiry is whether Congress could reasonably have thought that the regulated activities or events substantially affect interstate commerce. (See generally *Atlanta Motel* v. *United States* (1964) 379 U.S. 241 [13 L.Ed.2d 258, 85 S.Ct. 348]; *Moore* v. *Mead's Fine Bread Co.* (1954) 348 U.S. 115 [99 L.Ed. 145, 75 S.Ct. 148]; *Labor Board* v. *Jones & Laughlin* (1937) 301 U.S. 1 [81 L.Ed. 893, 57 S.Ct. 615, 108 A.L.R. 1352].) The validity of the proposition that significant sums of money placed in the hands of large numbers of state employees[5] can have a substantial impact upon national demand and monetary stability is surely obvious. Indeed, the proposition appears jurisprudentially unimpeachable in light of the United States Supreme Court's celebrated holding that personal consumption of home-grown wheat by farmers can sufficiently affect interstate markets to justify congressional regulation of the wheat consumed. (*Wickard* v. *Filburn* (1942) 317 U.S. 111 [87 L.Ed. 122, 63 S.Ct. 82].) To focus upon whether the regulated events physically occur wholly within the borders of a state is to resurrect old and discarded learning. (See, e.g., *United States* v. *E. C. Knight Co.* (1895) 156 U.S. 1

---

[4]Professor Mishkin has observed with respect to federal district court federal question jurisdiction that "[A] contention that a particular state enactment is invalid may be advanced in two ways: as a defense to an action under the statute—*which would be insufficient to ground removal to a lower federal court;* or as the basis for seeking an injunction against action pursuant to that statute—which would put it within the original jurisdiction of a national tribunal." (Mishkin, *supra,* at p. 177 (italics added).) Since the removal jurisdiction generally includes only cases which a federal district court could have entertained in the first place, there is no federal question jurisdiction for the former variety of litigation.

[5]See footnote 7, *infra.*

[39 L.Ed. 325, 15 S.Ct. 249]. Cf. *Hopkins* v. *United States* (1898) 171 U.S. 578 [43 L.Ed. 290, 19 S.Ct. 40].) "If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze." (*U.S.* v. *Women's Sportswear Assn.* (1949) 336 U.S. 460, 464 [93 L.Ed. 805, 811, 69 S.Ct. 714]; see also *Atlanta Motel* v. *United States, supra,* at pp. 268, 271 [13 L.Ed.2d at pp. 274, 276]; *United States* v. *Darby* (1941) 312 U.S. 100, 119 [85 L.Ed. 609, 619-620, 61 S.Ct. 451, 132 A.L.R. 1430].)

Nor do I believe that the Tenth Amendment and the fact that the regulatee is a state sovereign precludes congressional regulation in this instance. To be sure, there may be special limits upon the ambit of Congress' commerce clause power with respect to the activities of state governments (see *Maryland* v. *Wirtz* (1968) 392 U.S. 183, 204-205 [20 L.Ed.2d 1020, 1035-1036, 88 S.Ct. 2017] (Douglas, J., dissenting); Note, *State Sovereignty as a Limitation upon the Federal Commerce Power* (1936) 45 Yale L.J. 1118), just as there are limits on Congress' ability to affect such activities by exercising its article I, section 8 powers to "provide" for the "general welfare" (see generally *United States* v. *Butler* (1936) 297 U.S. 1 [80 L.Ed. 477, 56 S.Ct. 312, 102 A.L.R. 914]; but cf. *Oklahoma* v. *Civil Service Comm'n* (1947) 330 U.S. 127 [91 L.Ed. 794, 67 S.Ct. 544]; *Steward Machine Co.* v. *Davis* (1937) 301 U.S. 548 [81 L.Ed. 1279, 57 S.Ct. 883, 109 A.L.R. 1293]), and "lay and collect taxes." (See generally *New York* v. *United States* (1946) 326 U.S. 572 [90 L.Ed. 326, 66 S.Ct. 310]; *Metcalf & Eddy* v. *Mitchell* (1926) 269 U.S. 514 [70 L.Ed. 384, 46 S.Ct. 172].)

I concede, in short, that a balance must be struck between the interests which support the federal regulatory power and the need to minimize interference with the essential functions of state government. But the locus of this balance is not best discovered by invoking a specter of destruction of state government by Congress. Although Chief Justice Marshall was correct that "the power to tax involves the power to destroy" (*McCulloch* v. *Maryland* (1819) 17 U.S. (4 Wheat.) 316, 429 [4 L.Ed. 579, 607]), the reasoning underlying Justice Holmes' admonition "not . . . while [the United States Supreme Court] sits" (*Panhandle Oil Co.* v. *Mississippi* (1928) 277 U.S. 218, 223 [72 L.Ed. 857, 859, 48 S.Ct. 451, 56 A.L.R. 583] (dissenting opinion) reveals the essence of the task. (See also *New York* v. *United States, supra,* at pp. 577, 583 [90 L.Ed. at pp. 330-331, 334].) Courts, in part, are in the very business of striking balances and are sufficiently capable of insuring that principles and positions are not extrapolated to unjustifiable extremes.

Fully cognizant, then, of the importance of preserving viable state government, I nevertheless submit that the present situation is not one in which congressional action poses a threat to the life or integrity of our 50 state sovereigns. As far as I can discern, a state's principal interest in raising its employees' salaries is based on its need to compete effectively with private industry for qualified personnel. As long, however, as the federal government properly controls the salaries of private employees, there is little reason to fear that private salaries will increase faster than state salaries.

A state may further have an interest in seeing that its employees are well paid and comfortable. Since, however, a state has a similar interest in the welfare of privately employed persons and since this latter interest does not preclude federal control of private salaries, there can be no claim that a state's interest in the welfare of those it employs precludes congressional control of their salaries. I conclude, therefore, that although the target of federal regulation is an activity of state government, the regulation does not interfere unacceptably with state sovereignty *in this instance.*

Confronting, finally, the question of congressional purpose, I do not agree with the majority's conclusion that Congress did not intend to delegate the power to control state employee salary increases. Although the majority is correct that "an unexpressed purpose of Congress to set aside state regulation of internal affairs is not lightly to be inferred" (see, e.g., *Penn Dairies* v. *Milk Control Comm'n* (1943) 318 U.S. 261, 275 [87 L.Ed. 748, 756, 63 S.Ct. 617]; *Parker* v. *Brown* (1943) 317 U.S. 341, 351 [87 L.Ed. 315, 326, 63 S.Ct. 307]), the present situation seems to be one in which such an inference is proper.[6]

A primary purpose of the stabilization act, as stated in its section 202, is to "stabilize the economy [and] reduce inflation" in part by "stabiliz[ing] . . . wages [and] salaries." (See *Amalgamated Meat Cutters & Butcher Work.* v. *Connally* (D.D.C. 1971) 337 F.Supp. 737, 749.) Given this purpose, I have great difficulty believing that Congress intended to exempt the salaries of the nation's more than 10 million state and local governmental employees[7] without clarifying this intention either with explicit statutory language or at least some exposition to this effect in the legis-

---

[6]Because the threat posed by federal regulation to the viability and effectiveness of state government appears minimal in this instance, I believe the force of the presumption invoked by the majority should be correspondingly lessened.

[7]In 1972, state and local governments employed approximately 10,809,000 persons in the United States. (U.S. Dept. of Commerce, Statistical Abstract (94th ed. 1973) p. 433.) This figure was smaller but of a similar magnitude when Congress delegated wage-control powers to the executive branch.

lative record.[8] Because large accessions of disposable income in the hands of so substantial a segment of the labor force could significantly affect demand and monetary stability, I cannot assume without basis that Congress intended to deny the executive branch the flexibility to prevent such accessions.[9]

Moreover, were state employees' salaries left unregulated, the federal government might encounter difficulty enforcing controls on private salaries. Critical to the success of much economic regulation is that the regulated parties must be convinced that they are receiving equitable treatment. Were state employees' salaries left free to rise, many private employees might resist controls placed on their salaries. (Cf. *Davies Warehouse Co.* v. *Bowles* (1944) 321 U.S. 144, 157-158 [88 L.Ed. 635, 644-645, 64 S.Ct. 474] (Douglas, J., dissenting); Remarks of Senator Tower, 117 Cong. Record (1971) 43,674.)

The majority's assurance that the pocketbook concerns of state taxpayers afford a sufficient restraint on salaries like that of plaintiff Coan fails to remove doubts that Congress intended to leave such salaries unregulable. State employees typically maintain potent legislative lobbies, and at least two states—California and Ohio—have adopted pay increases which the presumably expert federal administrators later determined were unacceptably inflationary. Nor does the fact that a California statute commands the State Personnel Board to consider salary levels in the private sector when adjusting salary ranges for state civil service employees (Gov. Code, § 18850) squarely reach the issue. We are concerned, here, with

---

[8]Indeed, the legislative record reflects a contrary intention. (See, e.g., Sen. Rep. No. 92-507, 2 U.S. Code Cong. & Admin. News (92d Cong., 1st Sess. 1971) pp. 2283, 2286; Remarks of Senators Sparkman (Chairman of the Sen. Committee on Banking, Housing and Urban Affairs) and Tower, 117 Cong. Rec. (1971) 43,674-43,676; cf. Hearings before the House Committee on Banking and Currency, Oversight Hearings on the Operation of the Economic Stabilization Act of 1970, 92d Cong., 1st Sess., pt. I, pp. 202, 208, 232, 249.)

The majority takes the view that resort to the legislative record is improper because the stabilization act is unambiguous with respect to state employees' salaries. I cannot agree. The act merely delegates the power to stabilize wages and salaries; it does not specify whose wages and salaries are regulable. Nor, I believe, is the matter clarified by any presumption erected by case law, since 35 senators, convinced that state employees' salaries should be exempt from controls, felt it necessary or at least desirable that this intention be explicitly articulated in the act. (See p. 311 and fn. 10, *infra.*) Senators who desired that state employees' salaries be made regulable may also have felt explicit exemption to be the preferable mode of statutory composition.

[9]The precise issue before us is not whether Congress wanted state employees salaries controlled, but whether Congress wanted the President and his administrative delegatees *to have the option* to control these salaries should the fluid economic situation evolve in a manner dictating such control.

Congress' intent with respect to the entire nation and cannot assume that Congress was willing to rely upon California law and whatever similar prescriptions operate in other states to restrain public employees' salaries.

I conclude, in sum, that Congress intended that state employees' compensation should be amenable to federal control so that Congress could accomplish the objectives of the stabilization act. As acknowledged by the majority, federal legislation must be read to apply to the activities of state governments, absent congressional instruction to the contrary, when such application appears necessary to effectuate the legislation's purposes. (See generally *California* v. *United States* (1944) 320 U.S. 577, 585-586 [88 L.Ed. 322, 330-331, 64 S.Ct. 352]; *United States* v. *California* (1936) 297 U.S. 175, 185-187 [80 L.Ed. 567, 573-574, 56 S.Ct. 421]; 3 Sutherland, Statutes and Statutory Construction (3d ed. 1943) § 6302, pp. 192-193.)

The majority nevertheless takes the position and apparently finds dispositive that through its opinions, the United States Supreme Court has instructed Congress that the judiciary will not apply federal legislation to the activities of state governments unless Congress explicitly mandates this result. Congress, however, appears to have ignored this instruction at least in the present instance. I draw this inference from the fact that both the Senate and its Committee on Banking, Housing and Urban Affairs rejected proposals which would have explicitly exempted state employees' salaries from control. One can speculate, of course, that these rejections do not indicate the Senate's desire to give the President and his delegatees the power to regulate state salaries but rather reflect the Senate's belief that an explicit exemption would have been redundant given the presumption that state activities are unaffected when a statute fails to address the issue. To so conclude, however, is to assume that the many senators who supported the exemption proposals[10] failed to accept or comprehend the Supreme Court's message. Such a conclusion also ascribes unlikely motives to the senators who rejected the proposals.[11] A more probable explanation

---

[10]Thirty-five senators voted in favor of an amendment tendered by Senator Proxmire which would have exempted state and local employees' salaries from agency control. (See 117 Cong. Rec. (1971) 46,673.)

[11]As mentioned, one possibility is that the senators who rejected the exemption amendments wished to minimize statutory verbiage. That some senators would weigh this interest more heavily than the need to clarify ambiguity (see fn. 8, *supra*) I find extremely unlikely. Alternatively, the senators voting to reject might have been concerned that an exemption amendment would have incorrectly suggested that Congress wished to modify the coverage of the original stabilization act. This concern could have been eliminated by rewording the amendment, however, such that I find this too to be an unlikely explanation for the rejection.

is that the Senate and its committee disapproved explicit exemption because they intended that state employees' salaries should be regulable. (Cf. *California* v. *Taylor* (1957) 353 U.S. 553, 564-565 [1 L.Ed.2d 1034, 1041-1042, 77 S.Ct. 1037].)

In the end, I fear that the majority may have been influenced by a belief that California's state employees deserve the full raises prescribed by the Budget Act of 1973. Our task, however, is to ascertain the power and intent of Congress, not to pass on the economics or equity of a particular pay increase. The latter is the function of the Cost of Living Council and the subject of whatever appeals lie therefrom.

I would deny the relief requested.