[Civ. No. 61378. Second Dist., Div. Three. Dec. 31, 1982.]

MARGUERITE C. GEFTAKYS, Plaintiff and Appellant, v.
STATE PERSONNEL BOARD et al., Defendants and Respondents.

COUNSEL

Marguerite C. Geftakys, in pro. per., for Plaintiff and Appellant.

Russell Iungerich for Defendants and Respondents.

OPINION

**DANIELSON, J.—**

### STATUS OF THE CASE

Appellant Marguerite C. Geftakys (hereinafter appellant) appeals from a judgment denying her petition for peremptory writ of mandate which would command respondents, California State Personnel Board, California Department of General Services and California Office of Administrative Hearings (hereinafter respondents) to (1) rescind any claim to recoup asserted overpayments of salary to appellant, (2) refund the amount of such overpayments which respondents have recouped, and (3) to adjust appellant's salary upward two pay steps retroactive to May 1976.

### THE QUESTION ON APPEAL

The basic question on this appeal is whether, in May of 1974, appellant, a California state civil service employee, was entitled to receive all salary in-

creases which were received at that time by incumbents of the class of hearing officer I, at step three of the salary range for that class. If not, does the state have the right (1) to recoup alleged overpayments of salary paid by mistake to appellant, (2) to readjust appellant's pay step level downward from that in which she had been placed by mistake, and (3) whether the procedure which the state has used to accomplish those ends is lawful.

In the case at bench, the alleged overpayments resulted from the employee being placed, by mistake, in May of 1974, in an incorrect pay step which was two pay steps higher than her proper placement as provided by the rules of the California State Personnel Board.

The placement of the employee in an allegedly incorrect pay step was a result of the disruption and distortion of established personnel procedures which resulted from the intervention by the federal Cost of Living Council in the implementation of the salary program (Pay Plan) for California state employees for the 1973-1974 fiscal year. The Council's intervention both delayed and altered the implementation of that salary program.

CONTENTIONS

Appellant contends that from November 12, 1973, to May 1, 1974, she was an incumbent of step 3 in the class of hearing officer I, Office of Administrative Hearings, and was entitled to receive every salary increase that other incumbents on that step 3, within that classification received at that time, and her salary was not subject to adjustment after the lifting of the limitations imposed by the federal Cost of Living Council.

Respondents contend, and the trial court found, that any state employee, including specifically appellant, who moved from one class to another by transfer or promotion during the period between July 1, 1973, and May 1, 1974, did so subject to whatever adjustments would be necessary after the limitations imposed by the federal Cost of Living Council were lifted, and that appellant did so move on November 12, 1973, and her payroll status was subject to such adjustments.

Respondents further contend that when the Cost of Living Council's controls were lifted, in May of 1974, appellant's pay rate was not readjusted, but she was mistakenly retained, permanently, in pay step 3 of the class hearing officer I; was given a pay increase approximately 10 percent greater than that to which she was entitled, and that this windfall by mistake has served as the enlarged basis for computation of appellant's later salary increases and has resulted in overpayment of salary to appellant.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Adoption of the 1973-1974 Salary Program*

Pursuant to the Budget Act of 1973 and the mandate of section 18850, Government Code, the California State Personnel Board (hereinafter Board), on July 2, 1973, adopted a resolution, effective July 1, 1973, establishing and adjusting salary ranges for each class of position in the state civil service for the 1973-1974 fiscal year. The resolution provided for an average increase of 11.5 percent in state salaries.[1] (See *Coan* v. *State of California* (1974) 11 Cal.3d 286, 288 [113 Cal.Rptr. 187, 520 P.2d 1003].)

*Intervention by Federal Cost of Living Council*

On July 5, 1973, the federal Cost of Living Council (hereinafter Council) ordered that the salary increases authorized by the Board be delayed pending its study of the justification for the increases. The Board delayed the increases.[2]

By "Memo To: All State Agencies and Employee Organizations" dated July 6, 1973, and a press release of the same date, the Board gave notice of the Council's order of delay and announced that it would do everything that it could to implement the salary program.

On August 29, 1973, the Council allowed 7.0 percent, overall, increase in the state employees' salaries.

*The Adoption of Interim Salary Ranges*

On September 5, 1973, the Board adopted a modified salary increase program, effective July 1, 1973, within the limitations set by the Council. In a "Memo To: All State Agencies," dated September 7, 1973, the Board stated that "At the September 5, 1973, meeting the . . . Board adopted resolutions establishing interim salary ranges effective July 1, 1973. . . ."

On September 25, 1973, the Board issued a "MEMO TO: ALL STATE AGENCIES" on the "Status of 1973-74 Salary Program" explaining its action of September 5 and stating, in part, that: "On September 5 . . . [the Board] . . . adopted an interim salary program . . . ;" that to adhere to the overall 7.0 per-

---

[1] The percentage figures used by the parties in this litigation are approximations. They are not in issue.

[2] The Council's order did not apply to increases given to classes in which the maximum step in salary was $605 per month or less. Those increases, with which we are not concerned in this appeal, went into effect as scheduled.

cent limitation on salary increases imposed by the Council most ". . . state . . . employees received increases approximately 4.5% less the basic increase [which the Board had] originally approved . . . ;" that the classes for which a salary realignment had been approved, in addition to the basic increase, ". . . there was no equitable way of implementing [the] realignments without exceeding the 7.0% limitation or significantly reducing the basic increase for other groups of employees. Therefore, the implementation of salary realignments has been temporarily deferred. . . .

" . . . . . . . . . . . . . . . . . . . . . .

"It is important to emphasize that the program described above is an *interim program.* The Board is fully committed to restoring the full salary program approved July 2, 1973, as soon as it is legally possible to do so. . . . [A]ll possible legal action has been taken. . . . The salary funds appropriated but not allocated are available and will remain so. . . . [¶] We . . . will take prompt action when legally permitted to implement the Board's original salary program." (Italics in original.)

Meanwhile, a state employee, on behalf of himself and others, had petitioned our Supreme Court for a peremptory writ of mandate to compel California officials to prepare a payroll and to pay the wage increases authorized by the Budget Act of 1973. The court issued an alternative writ. (*Coan* v. *State of California, supra,* 11 Cal.3d at pp. 287-288.)

On January 9, 1974, the new executive officer of the Board issued a "Memo To: All State Agencies" in which he reiterated the Board's position that the pay plan placed into effect by its resolution of September 5, 1973, was an interim salary range (ISR) plan, stating: "On September 5, 1973, following cutbacks in the State's salary program imposed by the Federal Cost of Living Council, the State Personnel Board adopted an interim salary range (ISR) plan to be effective July 1, 1973. The ISR schedule was to be in effect until such time as the Cost of Living Council's decision or authority was changed in any way that would allow the implementation of the new salary range (NSR) plan adopted on July 2, 1973."

*The Lifting of Federal Wage Controls*

On April 19, 1974, our Supreme Court issued a peremptory writ of mandate ordering California state officials to prepare a payroll and pay the increases authorized by the Budget Act of 1973 and implemented by the resolutions of the Board. (*Coan* v. *State of California* (1974) 11 Cal.3d 286, 296 [113 Cal.Rptr. 187, 520 P.2d 1003].)

The federal Economic Stabilization Program ended on April 30, 1974, and the Council went out of existence.

*Restoration and Implementation of the 1973-1974 Salary Program*

On May 8-9, 1974, the Board adopted resolutions, effective May 1, restoring and implementing the new salary ranges and salary program for fiscal 1973-1974 which it had adopted 10 months earlier, on July 2, 1973. The immediate effect of the resolution was to implement *prospectively* the salary increases which had been adopted as of July 1, 1973. Salary warrants for all state employees, issued June 1, 1974, for the May pay period, were to be for the full pay increase which had been adopted by the Board and was intended to be effective July 1, 1973.[3]

On July 24, 1974, the Board adopted a resolution stating, in part: "WHEREAS, on May 1, 1974, the Board restored salaries held back by action of the Cost of Living Council intended to be effective July 1, 1973; and

". . . . . . . . . . . . . . . . . . . . .

"WHEREAS, it is the Board's intent to continue to seek retroactivity of the May 1, 1974, restoration program to July 1, 1973; therefore be it

"RESOLVED, That it be clearly known the intent of the May 1, 1974, salary resolution was to provide all State employees a salary rate that they would have been receiving had the July 1, 1973, salary program been in effect since July 1, 1973."

*The Salary Increases and Transfer of Appellant During the Period of June 1973, Through June 1, 1974*

Appellant was moved/promoted from class staff counsel I to class hearing officer I on November 12, 1974, while the Board's pay plan for fiscal 1973-

---

[3]Payment, retroactively of the salary increases for the period July 1, 1973 through April 30, 1974, which had been held up by the Council, was accomplished later.

The Economic Stabilization Program ended April 30, 1974, except as saved by its saving clause which provided that its termination should not operate to defeat any action theretofore commenced with respect to any right, etc., incurred prior to the termination date. The *Coan* decision, *supra,* became final May 19, 1974. On May 17 the United States obtained, from the United States District Court, a preliminary injunction enjoining California from implementing the Budget Act of 1973 in disregard of the August 29, 1973, order of the Council. This prevented California from paying *retroactively* the portion of the salary increases which had been stayed for the period from July 1, 1973, through April 30, 1974. California appealed to the Temporary Emergency Court of Appeals which, on September 19, 1974, ordered dismissal of the government's case for lack of jurisdiction. (*United States* v. *State of California* (1974) 504 F.2d 750, cert. den. *U.S.* v. *California* (1975) 421 U.S. 1015 [44 L.Ed.2d 684, 95 S.Ct. 2423]) When legally able to do so the state paid, *retroactively,* and with interest, the salary increases which had been held up by the Council for the period of July 1, 1973, through April 30, 1974.

1974 had been replaced by the interim salary range plan due to the intervention of the Council.

On June 30, 1973, appellant was employed by the California Department of Alcoholic Beverage Control, in class title "Staff Counsel I," receiving a monthly salary of $1,724, which was the fifth and maximum step of the five-step salary range for that class.

The July 2, 1973, resolution of the Board, adopting the fiscal 1973-1974 pay plan, called for the adjustment upward of the salary range for "Staff Counsel I" raising the maximum step from the rate of $1,724 to the rate of $1,901 monthly, a 10 percent increase.[4]

As part of its 1973-1974 Pay Plan, the Board had adopted additional resolutions, giving salary adjustments (increases) for additional classes of state employees, and realigning some classes of employees so as to provide a greater salary differential between those classes and some lower-paid classes.

Among the classes being both increased and realigned was "Hearing Officer I, Office of Administrative Hearings." The salary range for that class was adjusted upward 20 percent, made up of a 12.5 percent increase plus 7.5 percent salary realignment. The old salary range (OSR), which had five steps, ran from $1,641 to $1,995 per month. The new salary range (NSR), which also had five steps, called for pay rates of $1,995, $2,095, $2,201, $2,310 and $2,495, per month. The new salary range was to be effective July 1, 1973.

Before the new Pay Plan could be put into effect, it was stayed by the order of the federal Council.

The interim salary program, which was adopted by the Board in its resolution of September 5, 1973, provided a 5.5 percent increase for both the class of staff counsel I and the class of hearing officer I. The interim salary range (ISR) for staff counsel I provided for a maximum monthly rate of $1,819. Appellant, who had been receiving $1,724 monthly, the maximum rate for staff counsel I under the OSR, was given the 5.5 percent increase to the new interim rate

---

[4]Article 5 (§§ 90-112 inclusive) of title 2, California Administrative Code, includes the rules of the Board relating to compensation paid to state employees. Section 91 provides, in part: "As used in this article terms are defined as follows:

"(a) 'Salary range' is the minimum and maximum rate currently authorized for the class, (b) 'step' is the difference between two salary rates one full salary range number apart, (c) 'rate' is any one of the salary rates in the resolution by the board which establishes the salary ranges and steps of the Pay Plan. . . ."

As a practical matter, the term "rate" means the rate of pay, or actual salary, paid to the individual employee.

of $1,819. The remaining 4.5 percent of the increase, which had been authorized by the Board's resolution of July 2 for her class, was deferred.

Pursuant to the Board action of September 5 the new ISR for the class "Hearing Officer I" was adjusted to provide a 5.5 percent increase, as was done for the class "Staff Counsel I." The interim salary range for hearing officer I was adjusted to provide five steps with monthly rates of $1,733, $1,819, $1,911, $2,005 and $2,105. The remaining 14.5 percent of the (total 20 percent) increase which had been adopted by the Board for the class (12.5 percent basic increase plus 7.5 percent realignment, totaling 20 percent) was temporarily deferred. The resolution of September 5 deferred *all* realignment increases.

In November 1973, appellant was offered an appointment as hearing officer I with a starting salary of $1,911 per month and she accepted.

The class hearing officer I is a class with a "higher salary range" than the class "Staff Counsel I" within the meaning of rule 91(f).[5]

Rule 98.3 provides, in part: ". . . [A] permanent . . . employee who . . . moves to another class with a higher salary range shall be entitled to the rate in the salary range one step above the rate last received."

Effective November 12, 1973, appellant was appointed from the class "Staff Counsel I" to the class "Hearing Officer I, Office of Administrative Procedure" and "moved" to that class within the meaning of rule 98.3. Appellant's last rate of pay in class staff counsel I had been $1,819 per month; accordingly, in her new class, appellant was entitled to receive, and did receive, the rate of $1,911 per month, which was one step (5 percent) above the rate she had last received. In the ISR then in effect for the class hearing officer I the rate of $1,911 per month was the third step of the five-step salary range.

On appellant's "Report of Appointment," (to her new position) form 604, box No. 31 has to do with "Rate of Pay." In box No. 31, the figure "$1,911" and the letters "ISR" are filled in by typewriter.[6] The "Report of Appointment" was signed by appellant under the statement "I accept this appointment

---

[5]References herein to "rule" or "rules" are to the rules of the State Personnel Board, title 2, California Administrative Code, unless otherwise specified.

[6]In its memoranda to state agencies following the Council's stay of July 5, 1973, the Board repeatedly referred to the salary ranges which had been in effect on and before June 30, 1973, as the "old salary range" and used the acronym "OSR"; to the plan which it had adopted on July 2, 1973, as the "new salary range" and used the acronym "NSR"; and to the interim program which it adopted on September 5, 1973, as the "interim salary range," with the acronym "ISR."

subject to the conditions stated on this form and to approval by the State Personnel Board.''

When the federal wage controls were lifted, in May 1974, the Board sought to implement the long delayed 1973-1974 Pay Plan as quickly as possible. The Board used its electronic data processing system and salaries were increased based on current payroll information.

Many employees, including appellant, had changed classes during the period between July 1, 1973, and May 1, 1974, and had received part of their salary increases in their old class and the remainder in their new class. The Board's methods of processing personnel data provided no means of identifying transactions of this nature.

A total of 87 classifications, approximately 2,500 employees, had been authorized salary realignments in the 1973-1974 Pay Plan. During the interim period most basic salary increases were reduced and all realignment adjustments between classes had been deferred. This resulted in distortions of the relationships between classes.

As a result of the distortions, employees who were promoted during the interim from a class with no authorized realignment increase to a class with such an increase often were placed in a higher step in salary range than would have been the case if the full salary program had been implemented on July 1, 1973. When the full 1973-1974 Pay Plan was put into effect in May 1974, these employees received the deferred portion of the basic increase for their new class plus the full amount of the realignment increase. Thus they received the benefit of a realignment they would not have been entitled to had the full salary program been implemented on July 1, 1973. In fact, they received the realignment increase which had been authorized for a class of which they were not even a member at the time it was authorized.

Appellant was one of these employees.

The Board's electronic personnel data system did not identify appellant (and others) as having been moved to a new and higher paid class during the interim period. Accordingly, in May 1974, she was automatically given the previously deferred portion of the basic increase for hearing officer I, 7 percent, plus the deferred realignment increase for that class, 7.5 percent, a total increase of 14.5 percent. Employees who were in the class hearing officer I on July 1, 1973, were entitled to that 14.5 percent increase. Appellant had been in class staff counsel I on July 1, 1973, and was entitled to the 10 percent basic increase awarded to that class. She had already received a 5.5 percent portion of that in-

crease under the interim salary range program, and was entitled only to the remaining 4.5 percent when the full program was implemented in May 1974. In addition, of course, she had received the one step (5 percent) promotional increase provided by rule 98.3 when she moved from staff counsel I to hearing officer I.

Beginning with her June 1, 1974, salary warrant (for the month of May) appellant was paid $2,201 per month, an increase of five full steps, more than 25 percent, in the 10 months following July 1, 1973. This placed her in step three of the new salary range for hearing officer I. But for the computer error appellant would have received increases totalling three full steps, more than 15 percent.

Departments of the state government identified many of these payroll/personnel problems in May 1974, and corrected the salaries before the first warrants were released. Others were later identified and corrected. The Board made repeated efforts during 1974, 1975 and 1976 to identify employees who had been overpaid as a result of the disruption of the salary program. The Board sent memoranda to the personnel managers of state agencies asking their assistance in identifying such situations.

Appellant was notified by letter, dated May 11, 1976, from her employing agency, respondent Department of General Services, that she had been identified by the State Personnel Board as having been overpaid $6,740.74, of which $4,306.04 was repayable. Meanwhile, between May 1974 and May 1976, appellant had received two one-step increases and was then in step five of the salary range for hearing officer I.

In May 1976, the Board reduced appellant's salary range by two steps, placing her on step three of the range, at the salary rate she would then have been receiving if the 1973-1974 salary program had been fully implemented on July 1, 1973. Commencing in June 1976, respondents began to recoup $119.63 per month from appellant's salary. The recoupment was later suspended pending appellant's administrative appeal.

By letter dated August 7, 1976, appellant protested to the Board against repayment of the overpayment and against the adjustment of her salary range steps. On November 12, 1976, the Board responded that it treated appellant's letter as an appeal. The Board reviewed, considered and denied appellant's appeal. The Board also denied appellant's request for an oral hearing on her appeal.

On March 29, 1977, appellant filed a claim with the State Board of Control. That board notified appellant by letter of September 11, 1978, that it had ap-

proved her claim in the amount of $4,306.68, but that the Legislature had declined to approve it.

Appellant filed her petition for writ of mandate on March 16, 1979 . The case was heard on the pleadings, some declarations, documentary exhibits and argument of counsel. No live testimony was received. The court made extensive findings of fact and conclusions of law and denied the petition by judgment entered October 15, 1980, from which this appeal is taken.

DISCUSSION

*Nomenclature*

Throughout her case appellant makes much of her contention that when she was promoted to class hearing officer I on November 12, 1973, she was promoted to a "step," namely "step 3" of the salary range for that class.

This contention, and perception, by appellant is a fundamental error and tends to color and confuse the entire controversy. In considering civil service payroll and personnel matters it is essential that civil service nomenclature be used correctly.

Appointments and promotions in the "civil service," as relevant to the case at bench, are to "classes" of the civil service—not to "steps" within salary ranges. As used in the laws and rules governing the civil service, the terms "position," "class," "appointment," "salary," "salary range," "step," "rate," "promotion" and "demotion," etc., are words of art specifically defined in the California Constitution, the State Civil Service Act and in the rules of the State Personnel Board. (See Cal. Const., art. VII, Gov. Code, § 18520 et seq., and see rule 91.) The individual rates of pay are also formally established in the Board's officially adopted "Schedule of Salary Ranges and Salary Rates in the State Civil Service."

Using the nomenclature prescribed by those laws and rules, appellant, in November 1973, held a "position" in the "civil service" in "class" staff counsel I, and was being paid at the salary "rate" of $1,819 per month which "rate" was within the fifth "step," (or salary range number) of the five-step "salary range" authorized for that class.

On November 12, 1973, when appellant moved (was appointed) to class hearing officer I, she moved to a "class" with a higher "salary range." This was a "promotion." (Gov. Code, § 19367.) Since she moved to a "class" with a higher "salary range" she was also entitled to be paid at ". . . the rate in the salary range one step above the rate last received . . . ." (Rule 98.3.)

As prescribed by the Board's official schedule of salary ranges and salary rates in the state civil service "the rate in the salary range one step above the rate last received" was $1,911 per month. That is the pay "rate" which appellant received when she moved to her new "class." It has never been reduced.

Appellant's promotion was to the *class* hearing officer I; not to a *step*. The term "step" merely describes the difference between two salary "rates" which are "one full salary range number apart." (See rule 91.)

*Finding of Fact No. 10*

Before the trial court appellant did not object to finding of fact number 10, and in her brief appellant has stated that she concurs with finding of fact number 10. It reads: "Any state employee (such as petitioner Geftakys) who moved from one class to another by transfer or promotion during the period between July 1, 1973, and May 1, 1974, did so subject to whatever adjustments would be necessary after the limitations imposed by the federal Cost of Living Council were lifted."

*Appellant Was Not Entitled to the Salary Increase and Realignment Increase Provided for the Class Hearing Officer I Effective July 1, 1973*

Appellant first contends that she was not overpaid in that as an incumbent of the class hearing officer I during the time of the alleged overpayment, November 12, 1973, to May of 1976, she was entitled, under rule 108 of title 2, California Administrative Code, to each salary increase that all other incumbents within the same classification, range and step received during the same period of time, retroactive or otherwise. We disagree.

Appellant bases this contention on the second sentence of rule 108.

During the entire time relevant to this case rule 108 read as follows: "108. EFFECT OF SALARY RANGE CHANGES.

"Unless otherwise provided by resolution of the board, whenever the salary range for a class is changed, the salary of each incumbent in the class on the date the range change was made effective shall be adjusted by the total of the range differentials between the maximum salary rates and shall retain the same salary adjustment date. When range changes are made effective retroactively, incumbents in the class between the effective date of the range change and the date of the board action inclusive, shall also receive the same adjustment.

"When salary range changes become effective the same date as an employee's salary adjustment anniversary date, he shall first receive his range differential adjustment.

"When salary range changes become effective the same date as an employee's promotion, the salary adjustments shall be made in such order that the employee shall gain the maximum benefit from the adjustments."

The trial court concluded (conclusion of law No. 3) that respondents did not breach any duty owed to appellant under rule 108.

As set forth in Factual and Procedural Background, above, all actions of the Board in adopting and implementing the 1973-1974 Pay Plan were by resolutions of the Board. The Pay Plan was established, by resolution adopted July 2, 1973, effective July 1, 1973. In subsequent actions concerning the Pay Plan the Board reiterated its position that it would do everything it could to implement the salary program (July 6, 1973); that it was fully committed to restoring the full salary program (Sept. 25, 1973); and that the ISR's would be in effect until the Board would be allowed to implement the new salary range adopted on July 2, 1973 (Jan. 9, 1974). On May 8-9, 1974, the Board adopted resolutions, effective May 1, restoring and implementing the 1973-1974 pay plan and on July 24, 1974, the Board adopted the resolution providing; "RESOLVED, that it be clearly known the intent of the May 1, 1974, salary resolution was to provide all State employees a salary rate that they would have been receiving had the July 1, 1973, salary program been in effect since July 1, 1973."

Thus it is clear that the Board provided by resolution that range changes, as well as salary rates, realignments and all other personnel/payroll matters for the fiscal year 1973-1974, would be those that would "provide all state employees a salary rate that they would have been receiving had the July 1, 1973, salary program been in effect since July 1, 1973."

Appellant argues that the proviso clause in the first sentence of rule 108 applies only to that sentence; that a resolution of the Board cannot limit the effect of the second sentence of rule 108; and that, therefore, she was entitled, in May 1974, to the full realignment increase for hearing officer I, effective retroactively to July 1, 1973, even though she was not then a member of that class.

■ Generally, the same rules of construction which apply to statutes govern the construction and interpretation of administrative rules and regulations. (*Cal. Drive-In Restaurant Assn.* v. *Clark* (1943) 22 Cal.2d 287, 292 [140 P.2d 657, 147 A.L.R. 1028].) ■ The fundamental rules of statutory construction are that the court should ascertain the legislative intent so as to effectuate the

purpose of the law (*People* ex rel. *Younger* v. *Superior Court* (1976) 16 Cal.3d 30, 40 [122 Cal.Rptr. 122, 544 P.2d 1322]); and the statute must be read and considered as a whole in order to determine true legislative intent (*In re Bandman* (1958) 51 Cal.2d 388, 393 [333 P.2d 339]).

■ Rule 108 was promulgated by the Board. The Board obviously intended to provide a general rule as to the effect of salary range changes. In doing so, the Board reserved to itself the right to provide otherwise by resolution. The proviso in the first sentence of the rule reserves that right and power to the Board. To construe the proviso as being limited to the first sentence would lead to absurd consequences.

■ Statutory construction which leads to absurd conseqences should be avoided. (*People* v. *Colver* (1980) 107 Cal.App.3d 277, 285 [165 Cal.Rptr. 614].)

■ When rule 108 is read as a whole, it is apparent that the proviso contained in the first sentence was intended to apply to all four of the sentences in the rule which, by its own title, is to apply to range changes. Therefore, the Board's resolution that all state employees should have ". . . a salary rate that they would have been receiving had the July 1, 1973, salary program been in effect since July 1, 1973," prevails over rule 108 and governs appellant's salary increases during fiscal 1973-1974.

In addition, it seems clear that the range changes which figure in the case at bench were adopted by resolution of the Board on July 2, 1973, to be effective on July 1, 1973. July 2, 1973, was the date of the Board action. If the second sentence of rule 108 did apply, as appellant contends, it would probably apply only to incumbents of the class on July 1 and 2 of 1973. Appellant was not an incumbent of the class hearing officer I at that time. The intervention of the Council, delayed and disrupted the full implementation of the July 1, 1973, Pay Plan but the Board did not at any time repeal or cancel it. The mandate of our Supreme Court on April 19, 1974, ordered state officials to carry out the July 1, 1973, plan. (*Coan* v. *State of California, supra,* 11 Cal.3d at p. 296.)

*The Respondents Did Not Breach Duties Owed to Appellant Under the State Civil Service Act or the Rules of the State Personnel Board*

Appellant next contends that respondents breached their duties owed to her under sections 19257 and 19257.5, Government Code, and sections 91.5, 98.3 and 108 of title 2, California Administrative Code, and that the trial court's conclusion of law No. 3 is not supported by substantial evidence. This contention is without merit.

The trial court's conclusion of law No. 3 provided: "Respondents have not breached any duties owed to petitioner Geftakys under Government Code sections 19257 or 19257.5 or Title 2 of the California Administrative Code, sections 91.5, 98.3 or 108."

*Rule 98.3*

■ Appellant first argues that respondents breached their duty owed to her under rule 98.3 by "demoting" her two steps and by recouping asserted overpayments to her for the period before May 1976 because of that demotion.

Appellant was never "demoted" by the Board. As noted in the factual and procedural summary, above, applicant was in class staff counsel I in November 1973, when she moved to class hearing officer I, a class with a "higher salary range" within the meaning of rule 91(f). This was, in fact, a "promotion."

In 1973-1976 section 19367, Government Code (now § 19994.7) provided: "Any transfer of an employee from a position in a lower class to a position in a higher class is a promotion and any transfer of an employee from a position in a higher class to a position in a lower class is a demotion . . . ."

Appellant was never removed from the class hearing officer I. She has never been "demoted."

When appellant moved from staff counsel I to hearing officer I on November 12, 1973, she was given the one step (approximately 5 percent) salary increase required by rule 98.3. Her salary rate was increased from $1,819 per month to $1,911 per month. Appellant's salary has never been reduced. The recoupments are not based upon a demotion of defendant in contravention of rule 98.3, they are based upon overpayments to appellant for the period July 1, 1973, to May 1976, as the result of her having been placed on the payroll, by mistake, at a point two salary range numbers (two steps) higher than that to which she was entitled, when the July 1, 1973, salary program was restored in May of 1974.

*Rule 108*

We have dealt with appellant's contention as to the alleged breach of duty under rule 108, above.

*Rule 91.5*

■ As to the asserted breach of duty under rule 91.5, that rule provides: "Correction of Salary Rate. The effective date of correction of any salary rate

to which an employee is entitled under Rule 98.3, 98.6, 98.9, 102, 102.6, 106, or 108 shall be as of the time earned except that it shall not be prior to one year from the date the corrective action was initiated."

Appellant's promotion to hearing officer I, in November 1973, invoked rule 98.3. Appellant contends that rule 91.5 serves as a statute of limitations which prevents the readjustment of her salary status more than one year prior to the time corrective action was initiated and, since corrective action was initiated in May 1976, that action cannot be effective prior to May 1975.

Appellant's contention is without merit. The Board has never taken corrective action with respect to her promotion to class hearing officer I. Appellant is still in that class. The appointment and promotion was regular in all respects, and the 5 percent salary rate increase, which she received at that time under rule 98.3, has never been corrected. Rule 91.5 simply does not pertain to the case at bench.

*Sections 19257 and 19257.5, Government Code*

■ Appellant implies that she did not know the meaning of the acronym "ISR," which the Board often used for "Interim Salary Range," until written notice of overpayment was given her by letter dated May 11, 1976. In her brief she does not *deny* knowledge of the meaning of the term "interim salary range," or the symbol "ISR," but states that she was "not given express notice" until the letter of May 11, and that constructive notice cannot be imputed to her as resolutions, communications, memoranda and instructions of the Board are not distributed to each employee of the State of California. Though not stated clearly in her brief, appellant seems to argue that in the absence of compelling proof that she knew the meaning of "interim salary range" and "ISR" it must be assumed that she did not know. Therefore, she urges, the respondents have breached their duty to her under Government Code sections 19257 and 19257.5 because they "could have rectified the situation." Neither of those sections applies to the case at bench. The contention is without merit.

Section 19257 provides for compensation to a person who, acting in good faith, accepts an appointment or employment with the state ". . . contrary to this part or the rules prescribed hereunder. . . ."[7] It has never been contended by any party to this case that appellant's appointment to class hearing officer I was made ". . . contrary to this part or the rules prescribed hereunder. . . ." Her appointment was regular in every respect, and appellant is, in fact, still employed in that class.

---

[7]Government Code, title 2, division 5, part 2, State Civil Service Act.

Likewise, section 19257.5 does not apply. That section authorizes the Board to declare an appointment void from the beginning where such appointment would not have been made ". . . but for some mistake of law or fact . . . ." There is no aspect of this case to which section 19257.5 applies. The Board has not declared her appointment void from the beginning.

As to "interim salary range" and "ISR," the trial court found (findings of fact Nos. 18 and 19):

"18. Since all salary modifications due to transfers and promotions during the period of wage and price controls from July 1, 1973 through May 1, 1974 were under the Interim Salary Range, all state employees who tranferred or were promoted during that period were on notice that their rates of pay were subject to change upon the lifting of federal wage-price controls.

"19. Petitioner Geftakys had notice that her rate of pay was an interim rate of pay because the abbreviation 'ISR,' standing for Interim Salary Range, appeared in the rate of pay block (block 31) on her Report of Appointment."

The court's findings are correct; there was substantial evidence to support them.

In June 1973, appellant was being paid at the rate of $1,724. Effective July 1, 1973, she was scheduled to receive an increase of 10 percent, which is two salary range numbers, and which would have raised her rate of pay to $1,901 per month. Because of the Council intervention she did not receive that increase. She received *no* increase whatever until after the Board established ISR's by resolution of September 5, 1973, and then she received only a truncated raise of $1,819, ISR, per month. When she was promoted to hearing officer I, on November 12, 1973, she received the one step (5 percent) increase in her rate, to $1,911, ISR, required by rule 98.3. Appellant was directly affected, three times, by salary modifications in the period of June-November 1973.

In the civil service, as in any other work force, few subjects enjoy the currency and attention that is accorded to the pay structure and the likelihood of raises. It is inherently incredible that a directly affected career professional person, such as appellant, would not have been aware of the forces which were causing such substantial changes in the civil service pay structure and her own compensation at that time. Appellant signed her report of appointment upon which is typewritten "$1,911 ISR" in block 31, "Rate of Pay." The record shows that the Board's resolutions and memoranda relating to its 1973-1974 Pay Plan were distributed to all state agencies, and oftentimes to all employee organizations. It is unrealistic to contend that state employees are not charged

with notice of the Board's official pronouncements regarding the civil service Pay Plan unless those documents are distributed to each employee of the State of California.

In any event, the Board was required to administer its Pay Plan in accordance with the law and its rules and adopted resolutions. The Board did so.

Appellant, too, was bound by the same standards. It is settled that a public employee has no vested contractual right in any civil service position since the terms and conditions of civil service employment are fixed by statute and not by contract. (*Miller* v. *State of California* (1977) 18 Cal.3d 808, 814 [135 Cal.Rptr. 386, 557 P.2d 970].)

The Board had no authority to leave appellant at a place in the pay structure where she had been placed by clerical, mechanical, or computer error and contrary to the statutes and rules governing the civil service. The Board could not make a gift of public money. (Cal. Const., art. XVI, § 6.)

*The Procedures Which the Respondents Used to Recoup Overpayments Made to Appellant Were Lawful*

Appellant next contends that the methods by which overpayments were collected by respondents were unlawful in that they violated the due process provisions of the state and federal Constitutions, were in excess of respondents' powers and not authorized by the state Controller and that collection by payroll deduction under the State Administrative Manual is invalid because that manual was not duly enacted under the Administrative Procedure Act.

(a) *The Due Process Issue Was Not Raised in the Trial Court and Is Waived*

In her brief appellant contends that the recoupment procedure used by respondents in recovering overpayments somehow violated the due process requirements of our federal and state Constitutions. Appellant does not, however, specify the respect in which she was denied due process in this connection. The point was not alleged in her petition for writ of mandate and was not raised in the trial court. Appellant has waived this issue on appeal.

■ It is the general rule applicable in civil cases that a constitutional question must be raised at the earliest opportunity or it will be considered as waived. (*Hershey* v. *Reclamation District No. 108* (1927) 200 Cal. 550, 564 [254 P. 542]; see also *Savoy Club* v. *Board of Superiors* (1970) 12 Cal.App.3d 1034, 1042 [91 Cal.Rptr. 198].)

(b) *The Collection of Overpayments by the Accounts Receivable Process Was Lawful and Was Authorized by the State Controller*

There were two ways by which respondents could collect the overpayments from appellant's salary warrants. One was by a payroll deduction from the warrant. Under that method the Controller collects the money directly and issues a salary warrant for the net salary after the deduction.

The other method was by accounts receivable. In that method the Controller prepares the salary warrant for the full amount and delivers it to the state agency for delivery to the employee. The agency then endorses it pursuant to its authority under section 17051, Government Code, deposits the warrant into its account and issues a revolving fund check to the employee for the salary less the installment of overpayment being recovered.

The latter method was used by respondents in the case at bench and the trial court found that the Controller had authorized the collection in that manner.

Finding of fact Nos. 59 and 60 address this question: *"The Present Collections*

"59. Respondent Department of General Services has been effecting recoupment of the overpayments to petitioner on a monthly basis by withholding the salary warrants payable to petitioner Geftakys and issuing Department of General Services revolving fund checks for net salary less the monthly amount being recouped.

"60. The State Controller has authorized respondent Department of General Services to collect the overpayments from petitioner Geftakys in the foregoing manner."

There was substantial authority to support the finding that the Controller had authorized collecting the overpayments in this manner.

Section 12419.5, Government Code, authorizes the Controller, in his discretion, to offset any amount due a state agency from a person against any amount owing to such person by any state agency.

Evidence before the trial court indicated that, in the Controller's view, the authority of section 12419.5 was used only when the Controller made direct deductions from the warrants which he issued.

The Controller also utilizes an "accounts receivable" procedure to collect payroll overpayments and has established a procedure for using that method in

the "Controller's Payroll Procedures Manual." The use of that method confers de facto authority from the Controller to the agencies to use the accounts receivable method for collecting payroll overpayments.

The declaration of David Barrow, operations manager of the Controller's payroll services section, states in part: "3. The procedures established by the Controller for setting up and collection of accounts receivable are set forth in the Controller's Payroll Procedures Manual."

The declaration of Peter Pelkofer, deputy state controller, declared that he was familiar with the accounts receivable which were set up for collection of salary overpayments from appellant and: "3. From my review of the Controller's files and records in this matter, it appears that the Department of General Services fully complied with all applicable sections of the Controller's Payroll Procedures Manual in setting up accounts receivable for agency collection."

The declaration of Einer P. Christensen, personnel manager, Department of General Services, made it clear that the Controller's office cooperated in the collections of overpayments from appellant by the accounts receivable process, and that "[t]he method of collection established in this instance is the normal means utilized for such purpose and has been utilized by this Department for many years."

And the declaration of Ralph Zentner, chief of the payroll services section, office of the Controller, provides in part: "In April 1976 the Department of General Services established with this office 36 accounts receivable covering the period of November 1973 through April 1976. The accounts receivable were established based on documentation from the State Personnel Board and General Services.

"The payroll records reflect that none of the amounts set up as accounts receivable were collected by this office under the offset authority of Government Code Section 12419.5. Accounts receivable can be collected through two methods. Payroll deduction, which is accomplished by this office, or through agency collection, which is accomplished by the employing agency or department.

"Mrs. Geftakys' cancelled payroll checks . . . indicated that the Department of General Services has endorsed these payroll warrants and deposited them in the General Services General Checking Account, under the authority of Government Code Section 17051. After deducting the amount receivable, they are then issuing a General Services Revolving Fund check for the difference."

The State Administrative Manual also provides, with respect to the division of accounting of the office of the Controller, "[e]ach agency bears a relationship to the State Controller's Office similar to that of a branch office to its home office."

In view of the foregoing the trial court had substantial evidence to support its finding that the Controller authorized the recoupment of the overpayments by the accounts receivable procedure.

*The Payroll Procedures of the State Administrative Manual Are Not Subject to the Administrative Procedure Act*

▇▇▇ Appellant next contends that recoupments from her salary warrants were invalid, because the accounts receivable section of the State Administrative Manual was used in the process and it had not been promulgated in accordance with the California Administrative Procedure Act.

This contention is without merit.

*First*: This issue was never raised in the trial court and is not properly before us on appeal.

▇▇▇ On judicial review of the validity of an administrative regulation, the burden of proof is on the party challenging the regulation, since the administrative agency's action comes before the court with a presumption of correctness and regularity. (*Credit Ins. Gen Agents Assn.* v. *Payne* (1976) 16 Cal.3d. 651, 657 [128 Cal.Rptr. 881, 547 P.2d 993].) ▇▇▇ As to the quasi-legislative acts of administrative agencies, and the manual is one, judicial review is limited to an examination of the proceedings before the agency to determine whether its action in adopting the challenged regulation has been arbitrary, capricious, or entirely lacking in evidentiary support, or whether it has failed to follow the procedure and give the notices required by law. (*Pitts* v. *Perluss* (1962) 58 Cal.2d 824, 833 [27 Cal.Rptr. 19, 377 P.2d 83].) ▇▇▇ Not having raised this issue in the trial court, appellant has waived her right to challenge the promulgation of the State Administrative Manual on this appeal. There is simply no record before this court upon which it can determine whether there was proper promulgation or not. Without a record, the judicial review contemplated by the California Supreme Court in *Pitts* v. *Perluss* is foreclosed.

▇▇▇ *Second*: The Controller's Payroll Procedure Manual and the accounting procedures of the State Administrative Manual are exempt from the provisions of the Administrative Procedure Act.

Section 12470, Government Code, a part of article 5, provides in part: "In conformity with the accounting system prescribed by the Department of Finance pursuant to Section 13300, the Controller shall install and operate a uniform state payroll system for all state agencies, except the University of California. . . ."

Section 12477, Government Code, also part of article 5, provides: "Rules and regulations adopted under this article or Section 1156.1 are excepted from the provisions of the Administrative Procedure Act and shall be distributed in such form and manner as the Controller determines."

 *Third:* Even without the Controller's Payroll Procedures Manual or the State Administrative Manual, respondent Deparment of General Services had statutory authority for collection by accounts receivable in the manner in which the overpayments were recouped from appellant in the case at bench. Section 17051, Government Code, provides that authority and reads: "Whenever any warrant is drawn in favor of a payee having a claim against the State and is delivered to a State agency for delivery to a payee, and prior to delivery to the payee any facts or circumstances exist which would affect the validity or alter the amount of the claim, the person authorized to make payments out of any funds under the direct control of the State agency may indorse and deposit the warrant in the treasury to the credit of the fund or appropriation upon which it was drawn or deposit it to the credit of the appropriate account under his control. Where such a warrant is deposited to the account under the control of the State agency, it shall, when necessary, pay the portion of the claim then due and payable and return the balance to the treasury to the credit of the fund or appropriation upon which the warrant was drawn."

The authority of section 17051 was indorsed on the back of the salary warrants withheld from appellant. This express statutory authority overrides the need for an administrative regulation to authorize the same procedure.

*Appellant's Rights to Due Process Were Not Violated*

Appellant contends that she was denied due process of law because her salary was reduced two steps and the respondents commenced recoupment of the salary overpayments before giving her notice and an opportunity to be heard.

The record reflects that in late April 1976, appellant received notice by telephone from her employer, Department of General Services, that she had been identified as one of the state employees who had received salary overpayments as a result of the Council intervention and that arrangements would have to be made to collect the overpayments.

By letter dated May 11, 1976, Department of General Services notified appellant formally of the overpayments and of the need to collect the overpayments. The letter summarized, in three pages, the factual basis for the overpayments and enclosed 22 pages of attachments detailing the problem from July 1, 1973, to the date of notice. One of the attachments detailed by monthly pay period the gross and net amounts of the overpayments.

Commencing with the May 1976 pay period (paycheck of June 1, 1976) respondents reduced appellant's salary by two steps and commenced recoupment of the overpayments at the rate of $119.63 per month.

On August 7, 1976, appellant sent a ten-page letter to the Board, stating her case and asking that she be relieved of the obligation to repay the overpayments and to have her salary readjusted upward two steps to where it had been before the reduction. Respondents discontinued the recoupments from appellant's salary during the September pay period.

By letter dated November 12, 1976, the Board treated appellant's letter of August 7 as an appeal. It denied appellant's request that she not be required to make the repayments. The Board informed appellant that it had no authority to grant such relief and suggested that she take the matter up with the State Board of Control. The Board also informed appellant that the matter of her salary adjustment was within its purview and the matter of her appeal would be considered at their December meeting.

By letter dated January 6, 1977, the Board notified appellant that it had reviewed and considered her appeal, had been unable to find an appropriate basis for sustaining it and had denied her appeal on December 1, 1976, and had also denied her request for an oral hearing.

The Board did not recommence recoupment of the overpayments from appellant's salary until February 1979, when appellant had exhausted additional proceedings with the State Board of Control and the Legislature for forgiveness of the obligation.

 Appellant contends that respondents violated her right to procedural due process in that the reduction of her salary and the recoupment of past overpayments deprived her of property rights and that she had a prerequsite right to notice, opportunity to be heard, discovery, oral presentation of her case, the opportunity to present evidence through witnesses and documentation, to be represented by counsel, to be judged by an impartial and independent hearing officer, and to receive a written decision. In short, appellant contends that she was entitled to a full trial.

The trial court made extensive findings of fact (findings Nos. 41-58), the sufficiency of which appellant does not dispute, in support of its conclusion of law No. 5, which reads: "There was no violation of due process of law upon the facts of this case since no pre-deprivation hearing was required with respect to the recoupment of overpayments from petitioner Geftakys. *Califano* v. *Yamasaki,* 47 U.S.L.W. 4765 (June 20, 1979)."

The due process question presented must be considered in two parts: (1) the reduction in salary in order to correct clerical error which results in continuing overpayment of the state employee, and (2) the commencement of recoupment of past salary overpayments.

In *Califano* v. *Yamasaki* (1979) 442 U.S. 682 [61 L.Ed.2d 176, 99 S.Ct. 2545], the Supreme Court was confronted with a similar situation. Under the social security law recipients are sometimes overpaid. Section 204(a)(1) of the Social Security Act authorizes the Secretary of Health, Education and Welfare to recoup erroneous payments to recipients by decreasing future payments to which the overpaid person is entitled. However, section 204(b) commands that "there shall be no adjustment of payments to, or recovery by the United States from, any person who is without fault if such adjustment or recovery would defeat the purpose of this subchapter or would be against equity and good conscience."

We note that under the Social Security Act the secretary has the authority to waive, i.e., to forgive, the overpayment in a proper case. That is the reason for the existence of section 204(b).

In practice, under the Social Security Act, where ex parte determination is made that there has been an overpayment, the recipient is notified of that determination. The recipient may then file a written request either (1) seeking reconsideration of that determination, or (2) asking the secretary to waive recoupment in accordance with section 204(b).

The Supreme Court held that if the recipient seeks only a reconsideration of the determination under section 204(a) the matter is decided by a review of the papers and, if the decision goes against the recipient, recoupment then begins. However, if the recipient files a written request for a waiver of the overpayment obligation under section 204(b), that recipient is entitled to the opportunity for a prerecoupment oral hearing. Those who merely request reconsideration are not so entitled.

The reasoning behind the distinction is that the factors upon which the waiver of section 204(b) must be based, i.e., was the recipient "without fault," would

the adjustment defeat the purpose of the law, or would it be against equity and good conscience, require the opportunity for an oral hearing.

Applying the above principles to the case at bench, we first note that under the Constitution and the laws of the State of California, there can be no gift of public money and that a state agency cannot "waive" a debt due to the state. Thus, it would appear that the factors compelling an oral hearing in *Yamasaki* where waiver is sought are not found in this case, and there was no denial of due process in denying appellant an oral hearing.

As to recoupment of past overpayments from appellant's salary, however, we find that due process requires that state employees are entitled to notice and an opportunity to respond before recoupments of past salary overpayments are commenced. The consideration of the response can be upon the documents in the matter and does not require an oral, trial-type, hearing.

In the case at bench respondents provided appellant with adequate notice, but commenced recoupment before giving her an opportunity to respond and to request reconsideration. To that extent, respondents erred. However, they suspended recoupment in September 1976, after four recoupments, totalling $478.52, had been made, and did not recommence the process until February 1979, when all hearings and appeals had been exhausted. Under the circumstances of this case, and recognizing that the funds recouped were properly public money in the first place, we find that appellant has suffered no compensable damage thereby.

As to the reduction in appellant's salary, we find no error. State employees are not entitled to a preadjustment hearing before adjustments are made to their payroll status in order to correct a clerical error which results in overpayment of the employee.

To hold otherwise would lead to absurd results. It is the duty of all public employees and officials to take all reasonable and proper steps to protect the public fisc. In the consideration of this appeal, we have noted at least two statutes through which the Legislature has recognized the protection of the public purse to be state public policy. (See Gov. Code, §§ 12419.5, 17051.) There are others.

Appellant cites several decisions and Government Code section 19578, in support of her due process contentions, which are not relevant to the case at bench. Section 19578 is a part of article 3 of chapter 8 of the civil service law and relates only to disciplinary proceedings. The same is true of the cases cited by appellant, all of which relate to terminations from and demotions in the civil

service under disciplinary proceedings. The case at bench is not a disciplinary proceeding.

## DISPOSITION

The judgment of the trial court denying appellant's petition for writ of mandate is affirmed.

Lui, Acting P. J., and Potter, J., concurred.